**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GERALD FARMER, POMPEY HICKS,   )
ANTWON WILLIAMS, individually, and  )
on behalf of all others similarly situated,  )
and STEVEN EMLING, SILAS JUNIOUS, )
and ODELL STIFFEND, individually,   )
                                    )    Case No.  08 C 3962
             Plaintiffs,     )
                                      )
        v.                   )
                                      )
DIRECTSAT USA, LLC, *et al.*,      )
                                      )
             Defendants.    )

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On February 1, 2010, Plaintiffs filed the instant five-count Third Amended Complaint alleging that Defendants DirectSat USA, LLC ("DirectSat"), Unitek USA, LLC ("Unitek"), Jay Heaberlin, Lloyd Riddle, and Dan Yannantuono violated the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105, *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*  Plaintiffs also allege common law claims of unjust enrichment, quantum meruit, and breach of implied contract.  Before the Court is Plaintiffs' Motion for Partial Summary Judgment and Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(c).  Also before the Court is Defendants' Motion for Decertification and Plaintiffs' Motion to Strike.

For the following reasons, the Court denies Plaintiffs' Motion for Partial Summary Judgment and grants in part and denies in part Defendants' Motion for Summary Judgment.  In particular, the Court grants Defendants' Motion for Summary Judgment as to Plaintiffs' common

law claims of unjust enrichment, quantum meruit, and breach of implied contract as alleged in

Counts II, III, and IV of the Third Amended Complaint.  The Court also denies Defendants'

Motion for Decertification and grants Plaintiffs' Motion to Strike.

## BACKGROUND

### I.    Northern District of Illinois Local Rule 56.1

Northern District of Illinois Local Rule 56.1 assists the Court by "organizing the

evidence, identifying undisputed facts, and demonstrating precisely how each  side propose[s] to

prove a disputed fact with admissible evidence."  *Bordelon v. Chicago Sch. Reform Bd. of Trs.*,

233 F.3d 524, 527 (7th Cir. 2000).  Local Rule 56.1(a)(3) requires the moving party to provide

"a statement of material facts as to which the moving party contends there is no genuine issue."

*Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 632 (7th Cir. 2009).  "The opposing party is required

to file 'a response to each numbered paragraph in the moving party's statement, including, in the

case of any disagreement, specific references to the affidavits, parts of the record, and other

supporting materials relied upon.'"  *Id.* (citing N.D. Ill. R. 56.1(b)(3)(B)).  In addition, Local

Rule 56.1(b)(3)(C) requires the nonmoving party to present a separate statement of additional

facts that require the denial of summary judgment.  *See Ciomber v. Cooperative Plus, Inc.*, 527

F.3d 635, 643-44 (7th Cir. 2008).  Pursuant to the Local Rules, the Court will not consider any

additional facts proposed in the nonmoving party's Local Rule 56.1(b)(3)(B) Response, but

instead must rely on the nonmovant's Local Rule 56.1(b)(3)(C) Statement of Additional Facts

when making factual determinations.  *See id.* at 643; *Cichon v. Exelon Generation Co., L.L.C.*,

401 F.3d 803, 809 (7th Cir. 2005) ("Local Rule 56.1 requires specifically that a litigant seeking

to oppose a motion for summary judgment file a response that contains a separate 'statement …

of any additional facts that require the denial of summary judgment.'") (emphasis in original).

Moreover, the purpose of Rule 56.1 statements is to identify the relevant evidence supporting the material facts, not to make factual or legal arguments, *see Cady v. Sheahan*, 467 F.3d 1057, 1060 (7th Cir. 2006), and thus the Court will not address the parties' arguments made in their Rule 56.1 statements and responses. Also, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon*, 233 F.3d at 528. Further, the Court may disregard statements and responses that do not properly cite to the record. *See Cichon*, 401 F.3d at 809-10. Finally, it is well-established that courts may only consider admissible evidence in determining motions for summary judgment. *See Gunville v. Walker,* 583 F.3d 979, 985 (7th Cir. 2009). Indeed, a "party may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Id.* With these standards in mind, the Court turns to the relevant facts of the case.[1]

## II.    Evidentiary Objections

With regard to their Motion for Partial Summary Judgment, Plaintiffs contend that in each instance where Defendants responded to Plaintiffs' Statement of Facts without a corresponding record cite, the Court should deem the facts admitted. Specifically, in response to the factual statements contained in ¶¶ 1-12, 14, 28-30, 37-38 of Plaintiffs' Statement of Facts, Defendants provide no cite to any record evidence. This is contrary to both the letter and spirit of Local Rule 56.1. As the Seventh Circuit has explained:

---

[1]    To the extent that the parties' statement of facts with respect to Plaintiffs' Motion for Partial Summary, Defendants' Motion for Summary Judgment, and Defendants' Motion for Decertification contain duplicative facts, the Court has cited to the parties' initial statement of facts.

> The requirements of such rules are not onerous, but they are exacting.  Local Rule 56.1 makes explicit the responding party's burden of controverting the movant's position with adequate citations to the record. . . . [W]e have often repeated, that a party contesting summary judgment has a responsibility under such rules to "highlight which factual averments are in conflict as well as what record evidence there is to confirm the dispute."  It is reasonable to assume that just as a district court is not required to "scour the record looking for factual disputes," it is not required to scour the party's various submissions to piece together appropriate arguments.  A court need not make the lawyer's case.

*Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995).  Here, directly contrary to Local Rule 56.1's requirement that they make "specific references to the affidavits, parts of the record, and other supporting materials relied upon," Defendants do not support their responses with any record evidence.  The "consequence for noncompliance" with Local Rule 56.1 is that "the movants' assertions of material fact are deemed admitted . . . regardless of what contrary evidence is in the record."  *Bordelon,* 233 F.3d at 529.  Similarly, and also with regard to Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs failed to provide a response to Defendants' Statement of Additional Facts.  The Court thus deems those facts as admitted.  Finally, while the deficiencies in the parties' responses, or lack thereof, require admission of some of the facts proffered by the parties, "the court did not turn a blind eye to the facts elsewhere available, though it is permitted to do so by non-compliance with the local rule."  *Little*, 71 F.3d at 641.

## III.    Relevant Facts

### A.    Factual Background

Defendant DirectSat is a limited liability company with its principal place of business in King of Prussia, Pennsylvania.  (R. 180, Defs. Rule 56.1 Stmt. Facts ¶ 1.)  DirectSat provides fulfillment services to DirectTV.  *Id.* at ¶ 2.  UniTek, DirectSat's parent company, is a Delaware

limited liability company with corporate offices located in Blue Bell, Pennsylvania. *Id.* at ¶¶ 3-4. Jay Heaberlin is Vice President of Operations, Dan Yannantuono is CEO, and Lloyd Riddle was CEO of DirectSat. *Id.* at ¶¶ 5-7. Heaberlin, Riddle, and Yannantuono are individual Defendants in this lawsuit.

At its field offices, DirectSat employs project managers, field supervisors, and technicians. *Id.* at ¶ 13. DirectSat divides technicians into "tech teams," which the field supervisors oversee. *Id.* at ¶¶ 14-15. Plaintiffs Gerald Farmer, Pompey Hicks, Antwon Williams, Steven Emling, Silas Junious, and Odell Stiffend (collectively "Named Plaintiffs") worked as full-time, non-exempt satellite technicians for DirectSat. *Id.* at ¶ 8; R. 176, Pls. Rule 56.1 Statement of Facts, ¶ 1. Plaintiffs Farmer, Hicks, and Stiffend worked out of DirectSat's Bedford Park, Illinois field office, and Plaintiffs Williams, Emling, and Junious worked out of DirectSat's Bolingbrook, Illinois field office. (R. 180, ¶¶ 10-11.) None of the Named Plaintiffs worked at DirectSat's Algonquin, Illinois field office. *Id.* at ¶ 12.

Defendant UniTek, the parent company of Defendant DirectSat, provided Human Resources, Finance, Payroll, and Risk Management departments, as well as personnel policies relating to timekeeping, overtime, and use of company vehicles to DirectSat. *Id.* at ¶ 3. UniTek officers Scott Hisey, Elizabeth Downey, and Cathy Lawley had authority to hire and fire, direct and supervise work, make decisions regarding wage and hour classifications and employee compensation, and to devise, direct, implement, and supervise wage and hour practices relating to DirectSat employees. *Id.* at ¶ 4. Defendants Yannantuono, Riddle, and Heaberlin were officers of DirectSat during the relevant time period and applied Defendants DirectSat and UniTek's policies to the technicians. Yannantuono, Riddle, and Heaberlin also had authority to

hire and fire employees and to direct and supervise work of employees. Yannantuono and
Riddle further had authority to make decisions regarding wage and hour classifications and
authority to act on behalf of and in the interest of DirectSat in directing, implementing, and
supervising the wage and hour practices and policies relating to its technicians. *Id.* at ¶ 5.

      While employed by Defendants, technicians worked remotely at the homes of DirectTV
customers. (R. 180, ¶ 47.) During their employment with DirectSat, DirectSat technicians wore
DirectTV uniforms and drove company assigned vans bearing a DirectTV logo. *Id.* at ¶ 2.
Defendants sent daily job assignments to Plaintiffs' homes via facsimile or email that the
technicians reviewed prior to planning their route for the day. *Id.* at ¶ 7. After reviewing the
daily work assignments, technicians traveled to customers' homes to service or install satellite
dish systems. *Id.* at ¶ 8. Defendants had a policy requiring Illinois technicians to call dispatch or
the first customer of the day prior to arrival at the customer's location (R. 176, ¶ 12), and
Defendants required Plaintiffs to comply with the policies in Defendants' employee handbook.
*Id.* at ¶ 11. Yannantuono testified that DirectSat required technicians to call either dispatch or
the first customer before the technician recorded work time on his time sheet. (R. 176-2, Ex. 4,
177-78.) Typically, Plaintiffs contacted the customer or Defendants' call center as they first
started up their company assigned vans for the day. (R. 180, ¶ 9.) In addition, prior to reporting
to the day's first job, technicians would occasionally report to weekly meetings with supervisors
at the office location. (R. 193, ¶ 62.) Some technicians would also come to the office each day
to pick up equipment and/or their daily assignments. *Id.* at ¶ 63. DirectSat instructed
technicians to go home after they completed their final job for the day. *Id.* at ¶ 64.

      Defendants' policies also required employees to remove tools or equipment from

DirectSat's vehicles at the end of the day and informed technicians that they had the sole responsibility for any theft of tools or equipment left in the vehicles.  (R. 176-4, Ex. 22, ¶ 8.) Defendants assigned full-sized vans to Plaintiffs to carry a week's supply of equipment (forty to fifty boxes), ladders, and tools.  (R. 180, ¶ 6.)  The Named Plaintiffs declared that they loaded and unloaded equipment and satellite dishes from their company vans at the beginning and end of the workday.  (R. 176, ¶ 10.)  Yannantuono and Heaberlin testified that DirectSat's technicians were not required to load and unload equipment to and from their vehicles on a daily basis (R. 193, ¶ 13, 65), but the plain language of the policies contradicts their testimony. Defendants' company-owned vehicle policy also prohibited personal use of company owned vehicles.  (R. 176, ¶ 14.)

To compensate technicians for their work, DirectSat paid technicians an effective hourly rate or an employee's total production divided by total hours worked in a week.  (R. 17-62, Ex. 5, 221-24.)  DirectSat calculated an employee's total production by assigning a dollar amount to each type of task performed by an employee.  *Id*.  Yannantuono testified, for example, that the "piece rate" for an installation was a portion of what the customer paid for the installation.  (R. 176-2, Ex. 4, 11-13.)  The piece rates varied based on the technician's designated level – the higher the technician's level, the more money earned per installation.  *Id*.  At the end of the week, DirectSat aggregated the value of the work performed to determine the technician's production value for the week.  (R. 193-1, ¶ 42.)  When a technician's effective hourly rate was less than the applicable state or federal minimum wage, DirectSat would adjust the technician's hourly rate so that the technician received the appropriate minimum wage.  (R. 180, ¶ 28.) DirectSat also paid technicians an additional hourly component for overtime when they worked

over forty hours per week, which was also dependent on the effective hourly rate. (R. 176-2, Ex. 4, 11-13.) DirectSat calculated overtime by multiplying a technician's effective hourly rate by one-and-one-half. (R. 180, ¶ 29.) DirectSat then multiplied the number of hours worked over forty for the week by the overtime rate to calculate the amount payable in overtime to the employee. *Id.* at ¶ 30.

To ensure that it properly compensated its technicians in compliance with federal and state law, DirectSat tracked its technicians' time on weekly time sheets that it collected at local field offices and forwarded to payroll in Blue Bell, Pennsylvania. (R. 193-1, ¶ 43.) DirectSat required field supervisors to verify the completed time sheets prior to submitting them to payroll. (R. 180, ¶ 23.) Project Managers conveyed DirectSat's time keeping system, which included completion of time sheets by technicians, verification of time sheets by field supervisors, and forwarding of time sheets to payroll to technicians via Project Managers, who also held weekly "PA" calls with company executives. (R. 193-1, ¶ 45; R. 193-2, Ex. C, 69-74.) In addition to these PA calls and the direction provided at the local field offices, DirectSat would, on occasion, attach memoranda to technicians' pay stubs to remind them of the DirectSat time-keeping policy. (R. 193, ¶ 46.)

With regard to the type of work for which DirectSat compensated technicians and the recording of employee hours on time sheets, Yannantuono testified that DirectSat paid technicians for closing out jobs, selling insurance, selling DirectTV, and all hours worked on their time sheets, including attendance at meetings. *Id.* at 77-80. In fact, Yannantuono testified that DirectSat paid employees for non-production work to the extent that the employees included those hours worked on their time sheets. *Id.* Downey testified that payroll and project

8

administrators informed technicians to record non-production hours.  (R. 193-10, Ex. K, 37-40.)

Downey also testified that DirectSat told employees to record all time worked, and that typically,

as a guideline, DirectSat informed technicians to record either the time they arrived at the

warehouse or the time they arrived at the first customer job site of the day as the start time of a

particular morning.  *Id.* at 17-18.  Downey, however, also testified that DirectSat separately

compensated technicians for "non-productive" work time.  (R. 180-3, 37-40.)[2]  Heaberlin

similarly testified that DirectSat did not pay technicians for the time it took them to drive to their

first site, but that if technicians recorded their time for loading and unloading their vehicles that

DirectSat "absolutely" paid for that time.  (R. 193-4, Ex. D, at 198.)  Heaberlin also explained

that supervisors informed technicians about their initial daily start times at weekly meetings.  (R.

176-2, Ex. 6, 150.)  Yannantuono and Heaberlin further testified that they were unaware of any

written policy informing technicians how to complete a time sheet.  (R. 176-1, ¶ 20.)  In

addition, Heaberlin testified that a time sheet is likely inaccurate if it reflects exactly eight hour

days every day.  (R. 176-2, Ex. 6, 248.)  Meanwhile, Defendants did not conduct any state-wide

audits to confirm the time spent by technicians on various tasks, including time spent loading

equipment into vehicles, attending meetings, receiving work-related emails at home, and calling

customers in advance of service jobs.  (R. 176-2, Ex. 2, RTA, ¶¶ 98-111.)

Defendants required Plaintiffs to submit the days and hours the employee claimed as

worked on hand-written time sheets on an honor system basis.  (R. 176-1, ¶ 23.)  The Named

Plaintiffs' time sheets document the total hours the technicians claimed as work each day, but do

---

[2]      Defendants assert that non-productive work time included tasks such as driving between
jobs, but this assertion is unsupported by the evidence cited.  (R. 180, ¶ 22.)

not include daily start or stop times. *Id.* at ¶ 28. Defendants' payroll records indicate that the following class members worked the following hours for the week ending April 26, 2008: (i) DeCount Lamar Daniels, 27 hours; (ii) William G. Hlavka, 28 hours; (iii) Carlos Vaca Moreno, 27 hours; (iv) John Albert Myers, 30 hours; (v) Randall Calmese, 38.75 hours; (vi) Derrick James Evans, 32 hours; (vii) Hiraldo Irizarry Jr., 40 hours, 14.5 hours overtime; (viii) Marquisio M. Robinson, 26.5 hours; and (ix) Daniel Jones, 28 hours. *Id.* at ¶ 29.

### B. Named Plaintiffs' Testimony

Plaintiffs have produced testimony from six individuals, three of whom worked at DirectSat's Bolingbrook location and three of whom worked at DirectSat's Bedford Park location. (R. 193, ¶ 50.) None of the Named Plaintiffs worked at the Bolingbrook location after October 2007, and none of the Named Plaintiffs worked at the Bedford Park location after February 2008. (R. 193, ¶¶ 58-59.) Darrick Hundt, a field supervisor at the Bedford Park location, testified that he did not instruct technicians to record less than they actually worked. *Id.* at ¶ 53. None of the Named Plaintiffs worked in the Algonquin field office and none of the testimony proffered by the Named Plaintiffs directly demonstrates that an illegal wage and compensation policy applied in Algonquin or that such a policy was uniform in application. *Id.* at ¶ 57.

Named Plaintiff Gerald Farmer testified that supervisors and management encouraged technicians to stick to 40 hours per week when recording time and not to document either travel time or time spent putting together equipment for jobs from previous days. (R. 193-5, Ex. E, 81-84.) He also testified that "chances are, if you didn't go to a job site, you weren't being paid." *Id.* at p. 99. Farmer further testified that although, in some instances, executives at DirectSat

instructed him to record all of his time, he received varying instructions from a host of

individuals.  (R. 180, ¶ 31.)  In fact, when he asked whether DirectSat was paying him properly,

he received different responses from different individuals.  *Id.* at ¶ 37.  Farmer stated that "I feel

if [DirectSat] ha[s] a policy in place, then it should be only one answer."  *Id.*  Farmer explained

that he was implicitly encouraged to under report his hours to appear more efficient, but that

there were times when he was permitted to record in excess of forty hours in a given week.  (R.

180, ¶ 36.)  Farmer testified that he worked 8 to 12 hour days on average, and that many times he

worked 12 to 14 hour days.  (R. 180-2, Ex. E, 122; R. 192-1, Ex. 41, 103.)  He was unaware as to

the hours that other technicians reflected on their time sheets.  (R. 180, ¶ 39.)

Further, Named Plaintiff Pompey Hicks testified that he was among a group of

technicians who initially recorded drive time on their time sheets, but then "Theresa" told him

that he could not do so.  (R. 176-3, Ex. 11, 43-44.)  Hicks also testified that he never heard his

supervisor tell anyone to record a pre-determined number of hours.  (R. 193, ¶ 51.)  Hicks,

however, stopped recording his time because he did not want to submit to a consultation with his

supervisor.  *Id.* at ¶ 52.  He testified that he worked between 10 to 12 hours a day.  (R. 180-2,

43.)  Hicks admitted that he never heard field supervisor Brian Bramson tell any technicians that

they could not record more than forty hours in a single week.  (R. 180, ¶ 34.)

Named Plaintiff Steven Emling testified that the DirectSat CEO informed technicians to

record all time worked, but that other supervisors told the technicians that the CEO was just

"covering bases" and that "we all know if you go above 40, your hourly is going to fall and

that's kind of why everybody stays at 40."  (R. 176-3, Ex. 12, 37; R. 93, ¶ 54.)  In addition to the

11

other Named Plaintiffs, Emling identified Jeremy Stipp and Gary Shear as individuals with whom he had worked at DirectSat. (R. 180, ¶ 52.)

Also, Named Plaintiff Antwon Williams testified that he spent a portion of his time with DirectSat following a different company's time recording policies. (R. 180, ¶ 43.) He also testified that he was not paid for the time between jobs, the time at meetings, or the time spent driving home. (R. 176-2, Ex. 10, 63.) He claimed that, in a given week, his time-sheet could be missing anywhere from 10 to 15 hours of work. (R. 180, ¶ 45.) He also stated that Emling did his "own thing' when it came to recording time. *Id.* at ¶ 44. Williams identified Gary Shear, Eddie Rude, "Jeremy," and "Corey," as technicians who joined him at meetings. (R. 180, ¶ 51.)

Named Plaintiff Silas Junious testified that he initially recorded all the time he worked, but subsequently his supervisors instructed him that he could not include driving time or time spent putting dishes together. He did, however, still record his drive time when his jobs were local. He also testified that the only time DirectSat paid its technicians was when they were at the job site. (R. 176-3, Ex. 13, 64-66; R. 93, ¶ 55.) In addition, Junious testified that he was required to report 40 hours on his time-sheet regardless of the number of hours he actually worked. (R. 180, ¶ 46.) Aside from the individuals identified by Williams, Junious only identified "Chris" as a co-worker at DirectSat. *Id.* at ¶ 53.

In addition, Named Plaintiff Stiffend testified that his supervisor instructed him not to include time for constructing dishes, travel time between work sites, or time for planning routes on his time sheets. (R. 176-3, Ex. 8, 73, 102-04, 117.) He also asserted that he was told that he could not record more than 42 hours in a given week and that he recorded the accurate number of hours he worked whenever he worked less than 40 hours per week. (R. 180, ¶¶ 40-41.) Stiffend

identified Frank Kane, Robert Deeds, Twon Bridges, Joey Carpenter, "Laron," "Raymond," "Cornelius," and "Nicole" as individuals who worked at DirectSat during his employment.  *Id.* at ¶ 54.

The Named Plaintiffs also testified that they did not include the time they spent driving between assignments on their time sheets, though Hicks had initially done so before an instructor told him not to.  (R. 176-1, ¶ 2.)  Also, the Named Plaintiffs declared under oath that they each typically worked six days a week and 10-12 hours per day.  (R. 176-1, ¶ 33.)  In addition, the Named Plaintiffs admitted that DirectSat paid them for all of the time, including recorded overtime, that they submitted on their time sheets.  (R. 193, ¶ 61.)  Moreover, at least some of the time recorded on the Named Plaintiffs' time sheets is accurate, and Named Plaintiffs are unable to discern which of their times sheets are inaccurate.  (R. 180, ¶¶ 49-50.)

### C.    GPS Tracking

DirectSat owned vehicles that it assigned to technicians that contained a global positioning system ("GPS").  (R. 176-3, Ex. 20.)  @Road, Inc. provided DirectSat with Daily Activity Reports ("DARs") that provided the starting position, time of each movement, distance traveled, speed of travel, and location and duration of any stops for each vehicle contained in its contract.  (R. 176-3, Ex. 20, ¶ 20.)  DirectSat could access a website operated by @Road, Inc. and print out DARs for any vehicle in its fleet, but DirectSat only received the reports when it accessed the website.  (R. 193-1, Ex. B, ¶ 7.)  DirectSat also received daily Exception Reports from @Road, Inc. which indicated when a monitored vehicle violated a specific, pre-determined, set parameter.  (R. 193-1, Ex. B, ¶ 5.)  DirectSat only downloaded DARs if a person with access to the Exception Reports believed that an exception required investigation.  *Id.* at ¶ 8.  DirectSat

13

terminated class member Dontez Josey's employment after the GPS on his assigned vehicle indicated that someone was using the vehicle off hours. (R. 176-1, ¶ 37.)

### D. Plaintiffs' Expert Report

Plaintiffs have served a Preliminary Expert Report dated June 14, 2010 on Defendants. (R. 192, ¶¶ 20-21.) In the expert report, Oran Clemons opines that Defendants' practice of "inform[ing] named plaintiffs and class members that they were to use the time they finished the last job and not their return to home as their ending time on their timesheets . . . ignores the continuous workday rule" because the practice "does not allow the named plaintiffs and class member to capture the time transporting tools and equipment back home [and] unloading tools and equipment." (R. 192-2, Ex. 46 at 18.) Attached to Clemons' report is a summary of the GPS data that Defendants provided to Plaintiffs. (*Id*., Ex. 46.) After reviewing the GPS data and comparing it to related payroll records produced by Defendants, Clemons found that class members worked off-the-clock, on average, over 15 hours per week. (R. 192, ¶ 24; 192-2, Ex. 46, 17.) Clemons explained that Plaintiffs only provided him with the start and stop times for each technician each day. (R. 198-1, Ex. X, 155-56.) He admitted that he had no way of knowing whether any of the technicians used the vehicle for some personal reason during the day. *Id.*

### E. Class Certification

On December 30, 2008, the Court granted Plaintiffs' Motion for Class Certification and certified the following class: "all individuals who were employed by DirectSat as service technicians or production technicians in the state of Illinois between December 3, 2006 and June 11, 2008." (R. 40, Order.) In its December 30, 2008 order, the Court found that Plaintiffs

satisfied the numerosity, commonality, typicality, and adequacy of representation requirements

of Federal Rule of Civil Procedure 23(a), as well as the superiority and predominance

requirements of Rule 23(b)(3).  The Court denied Defendants' Motion for Reconsideration of the

Court's class certification on June 29, 2009.  (R. 82, Order.)

## LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c)(2).  A

genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

2505, 2510, 91 L. Ed. 2d 202 (1986).  In determining summary judgment motions, "facts must be

viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as

to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007).

The party seeking summary judgment has the burden of establishing the lack of any genuine

issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91

L.Ed.2d 265 (1986).  After "a properly supported motion for summary judgment is made, the

adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"

*Anderson*, 477 U.S. at 255 (quotation omitted); *see also* Fed.R.Civ.P. 56(e)(2).

### II. Motion for Decertification

In deciding a motion to decertify a class, the Court tests whether economy favors

adjudicating multiple disputes in a single action without sacrificing fairness.  *See Ellis v. Elgin*

15

*Riverboat Resort*, 217 F.R.D. 415, 418-19 (N.D. Ill. 2003) (citing *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 155, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982)). "Initially, a court determining whether to certify a class must generally accept as true the allegations in support of certification rather than examine the merits of the case." *Ellis*, 217 F.R.D. at 419 (citing *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 598 (7th Cir. 1993)). "However, because 'the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action,' the court must sometimes 'probe behind the pleadings before coming to rest on the certification question.'" *Id.* (citing *Falcon,* 457 U.S. at 160, 102 S. Ct. 2364) (quotations omitted)).

Federal Rule of Civil Procedure 23(a) states: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Failure to meet any of these Rule 23(a) requirements precludes class certification. *See Oshana*, 472 F.3d at 513; *Pruitt v. City of Chicago*, 472 F.3d 925, 926-27 (7th Cir. 2006).

In addition to satisfying the requirements under Rule 23(a), a party seeking class certification must also establish that the proposed class satisfies one of the requirements set forth in Rule 23(b). *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997); *Oshana*, 472 F.3d at 513. In this case, Plaintiffs requested certification of the proposed class pursuant to Rule 23(b)(3), which applies when "the questions of law or fact

16

common to class members predominate over any questions affecting only individual members, and [when] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see Amchem*, 521 U.S. at 615-16.

The party seeking class certification has the burden of establishing that certification is proper. *See Oshana*, 472 F.3d at 513. Finally, district courts have broad discretion in determining motions for class certification. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 345, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979); *Payton v. County of Carroll*, 473 F.3d 845, 847 (7th Cir. 2007).

## ANALYSIS

## I.     Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs filed suit against Defendants to recoup technicians' unpaid wages pursuant to state and federal law. In their Motion for Partial Summary Judgment, Plaintiffs seek judgment based on the following arguments: (i) Defendants failed to pay technicians for drive time that is compensable time worked under the FLSA; (ii) Defendants failed to maintain accurate records of technicians' hours worked as required by the FLSA and IMWL; and (iii) Defendants failed to pay class members as required by the FLSA and IMWL. For the following reasons, the Court denies Plaintiffs' Motion for Partial Summary Judgment.

### A.     Failure to Pay Compensable Time Worked Pursuant to the FLSA

Plaintiffs first seek judgment against Defendants on behalf of the class members for failure to pay Illinois technicians for drive time to their first job and to their homes from their last job of the day. Plaintiffs premise their claim on evidence that Defendants required Plaintiffs to unload their company vans at the end of the workday, that Plaintiffs would load company vans

17

with tools and equipment prior to the start of the workday, and that Plaintiffs called customers prior to arrival at the first customer's location at the start of each work day.

In response, Defendants argue that Plaintiffs ignore the effect of the federal Portal-to-Portal Act. The Portal-to-Portal Act established two categories of activities which include those activities that are "principal as opposed to "preliminary" or "postliminary" activities. *See* 29 U.S.C. § 254; 29 C.F.R. § 785.24; *see also Gonzalez v. Farmington Foods, Inc.,* 296 F. Supp. 2d 912, 924 (N.D. Ill. 2003) ("Congress enacted the Portal-to-Portal Act to clarify the duties of employers regarding the compensation of employees for activities that constitute work but which occur before, after, or during the work shift."). In general, an employer is not responsible for compensating employees for "walking, riding, or traveling to and from the actual place of performance of the principal activity or activities" or for "activities which are preliminary or postliminary to [the] principal activity or activities" of a particular job. *See* 29 U.S.C. § 254(a)(2). As the Supreme Court explains, the term "principal activity or activities" of the Portal-to-Portal Act "embraces all activities which are an 'integral and indispensable part of the principal' activities." *IBP, Inc. v. Alvarez,* 546 U.S. 21, 30, 126 S.Ct. 514, 163 L.Ed.2d 288 (2005) (citation omitted); *see also Musch v. Domtar Indus., Inc.,* 587 F.3d 857, 859 (7th Cir. 2009). "An activity is integral to a principal activity if the activity is made necessary by the nature of the work performed, it fulfills mutual obligations between the employer and the employees, the activity directly benefits the employer in the operation of the business, and the activity is closely related to other duties performed by the employees." *Hiner v. Penn-Harris-Madison Sch. Corp.,* 256 F.Supp.2d 854, 859 (N.D. Ind. 2003) (citing *Steiner v. Mitchell,* 350 U.S. 247, 252, 76 S.Ct. 330, 100 L.Ed. 267 (1956)). Thus, activities such as putting on

18

protective safety gear and walking from a locker room prior to performing shift work may be compensated activities if they are integral and indispensable to the individual's employment. *See IBP, Inc.,* 546 U.S. at 30; *see also Steiner,* 350 U.S. at 256 (battery manufacturer must compensate employees for thirty minutes spent putting on protective clothing and bathing because activities were indispensable to employees' health and safety).

Here, there is a genuine issue of material fact as to whether the unloading and loading of vans and initial phone calls were principal activities, namely, whether these tasks are necessary, directly benefit Defendants, and are closely related to other work duties performed. *See Gonzalez,* 296 F.Supp.2d at 924-25 ("in order for a particular activity to be 'integral and indispensable,' it must be necessary to the principal activity performed and done for the benefit of the employer"). More specifically, Defendants dispute Plaintiffs' factual assertion that they were required to unload and load their equipment from their vehicles every day as part of their job responsibilities. In addition, Plaintiff fails to cite to any legal authority that making telephone calls to the first customer prior to arrival – or any such similar task – is a principal activity in the first instance.

In the alternative, Defendants argue that even if the technicians' work was compensable under the IMWL and the FLSA, the work was nonetheless *de minimis.* To clarify, under the FLSA, "employees cannot recover for otherwise compensable time if it is *de minimis.*" *Lindow v. United States,* 738 F.2d 1057, 1062 (9th Cir. 1984). Courts have considered four factors in determining whether an activity is *de minimis* as a matter of law: (1) the amount of daily time spent on the additional work; (2) the administrative difficulty in recording the time; (3) the size of the aggregate claim; and (4) the regularity of the work. *See Gonzalez,* 296 F. Supp. 2d at 927-

19

28 (citing *Lindow,* 738 F.2d at 1062-63).  In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 693, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), the Supreme Court held that activities which involve "insubstantial and insignificant" periods of time are *de minimis* and should "not be included in the statutory workweek."

In response to this argument, Plaintiffs assert that although the amount of time it takes to load or unload a van might not exceed fifteen minutes per day, the amount of time in the aggregate was substantial.  Plaintiffs, however, fail to support their argument with citations to the evidentiary record.  As such, Plaintiffs' conclusory argument, even if the evidence supported it, does not warrant the grant of summary judgment.  Meanwhile, the *Lindow* court concluded that "[m]ost courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable."  *Lindow,* 738 F.2d at 1062 (citing cases); *see also Gonzalez,* 296 F. Supp. 2d at 928 (finding genuine issue of material fact exists as to whether employees' donning and doffing of sanitary and safety equipment before and after shifts and during meal periods, equipment cleaning and knife sharpening activities were *de minimis* where Plaintiffs pointed to evidence that the activities took 14.6 minutes per day and Defendants contended activities took as little as five minutes.)

Finally, Plaintiffs' reliance on a company-wide policy, which required technicians to unload their equipment from their vans each night, cannot demonstrate the lack of a genuine issue of material fact because Plaintiffs do not cite to evidence to demonstrate the actual time spent by employees on such activities.  Because there is a genuine issue of material fact as to whether the activities performed by Plaintiffs at the beginning and end of the work day were *de minimis*, the Court denies Plaintiffs' summary judgment motion in this regard.

20

**B.      Failure to Maintain Accurate Records Pursuant to the FLSA and IMWL**

Next, Plaintiffs move for partial summary judgment arguing that Defendants failed to

maintain accurate records under the FLSA and IMWL.  Both the FLSA and IMWL require

employers to maintain records of employee hours worked.  *See* 29 U.S.C. § 211(c); 820 ILCS §

105/8.  Implementing regulations for each statute requires employers to maintain records of the

hours worked each workday and total hours worked each workweek.  *See* 29 C.F.R. §

516.2(a)(7); 56 Ill. Admin. Code 210.700(f); *see also Skelton v. Am. Intercontinental Univ.

Online*, 382 F. Supp. 2d 1068, 1074 (N.D. Ill. 2005) ("[t]he IMWL parallels the FLSA, and thus

the same analysis applies to claims made under the IMWL and FLSA").  Here, Plaintiffs contend

that Defendants "turned a blind eye to the unrecorded hours of compensable work."  (R. 176, Pls.

Mot. at 8.)

The failure to maintain adequate records impacts a *prima facie* case regarding unpaid

wages and the parties' burdens.  *See Mt. Clemens*, 328 U.S. at 687-88, 66 S.Ct. at 1192; *see also

Brock v. Norman's Country Market, Inc.,* 835 F.2d 823, 828 (11th Cir. 1988) ("It is firmly

established where an employer has not kept adequate records of their employees' wages and

hours as required by the FLSA, the employees will not be denied a recovery of back wages on

the ground that their uncompensated work cannot be precisely determined.") (citation omitted).

Where an "employers['] records are inaccurate or inadequate," an employee can carry out his

burden of establishing a prima facie case if he proves that he performed work for which he was

not compensated by "produc[ing] sufficient evidence to show the amount and extent of that work

as a matter of just and reasonable inference."  *Mt. Clemens*, 328 U.S. at 687-88, 66 S.Ct. at 1192.

"The burden then shifts to the employer to come forward with evidence of the precise amount of

work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.*

Viewing the facts in a light most favorable to Defendants, there is a genuine issue of material fact for trial whether Defendants maintained accurate records in relation to Plaintiffs' *prima facie* case regarding damages. More specifically, Plaintiffs have presented evidence – which Defendants dispute – that employees carried the burden of accurately reporting their own hours and that Defendants did not audit or investigate the inaccuracies of the recorded time. (R. 176-1, ¶¶ 23, 40.) Therefore, the Court denies Plaintiffs' summary judgment motion in this regard.

That being said, Plaintiffs cannot maintain a stand-alone private cause of action for record keeping violations under the FLSA. *See Floyd v. Excel Corp.,* 51 F. Supp. 2d 931, 934 n.5 (C.D. Ill. 1999) (highlighting decisions in which courts have found that there is no private right of action for FLSA record keeping violations); *see also Castillo v. Givens,* 704 F.2d 181, 198 n.41 (5th Cir. 1983) (noting there is no private enforcement mechanism for record keeping violations under the FLSA); *East v. Bullock's Inc.,* 34 F. Supp. 2d 1176, 1182-83 (D. Ariz. 1998) ("Fair Labor Standards Act (FLSA) does not provide a private right of action for recordkeeping violations of the Act"); *Schneider v. Landvest Corp.*, No. 03 CV 02474, 2006 WL 322590, at *23 (D. Col. Feb. 9, 2006) (same). In fact, only the United States Department of Labor's Administrator of the Wage and Hour Division can bring a recordkeeping enforcement action under the FLSA. *See Elwell v. University Hosp. Home Care Servs.,* 276 F.3d 832, 843 (6th Cir. 2002) ("Authority to enforce the Act's recordkeeping provisions is vested exclusively in the

Secretary of Labor."); *see also Nicholson v. UTi Worldwide, Inc.,* 09 C 722, 2010 WL 551551, at

*5 (S.D. Ill. Feb. 12, 2010) (citing 29 U.S.C. § 211(a); 820 ILCS 105/12(a)).

###    C.    Failure to Pay Technicians as Required by the FLSA

Plaintiffs also seek summary judgment on their claims pursuant to the FLSA and IMWL

for failure to pay overtime wages. Both the FLSA and IMWL require employers to pay

employees for all hours worked over forty hours per week at a rate of one and one-half times the

regular rate. *See* 820 ILCS §105/4a(1); 29 U.S.C. § 207(a)(1). It is undisputed that when a

Class Member submitted over 40 hours in a week as worked on his time sheet that Defendants

paid the technician overtime and that Defendants did not pay overtime if a Class Member did not

submit over 40 hours worked. Besides citation to these facts, however, Plaintiffs' argument in

support of their motion for summary judgment is conclusory and underdeveloped. Plaintiffs

merely assert: "Having shown that Class Members worked more hours than defendants recorded

as worked (¶ 29) and that those hours included over forty (40) hours of work in a week (*Id.*), and

that Defendants only paid for those hours it recorded as worked (¶ 18), the Named Plaintiffs

provide irrefutable evidence Defendants violated the IMWL and FLSA." (R. 176, Pls.' Mot. at

10.) The facts to which Plaintiffs cite, however, are merely a compilation of Defendants' payroll

records for the week ending April 26, 2008 and the undisputed assertion that Defendants only

paid technicians for time recorded on their time sheets. These facts alone do not "provide

irrefutable," or even any, evidence, that Defendants violated the IMWL or FLSA.

Plaintiffs also point to "one example" of Defendants' failure to meet the time and a half

standard. Specifically, Plaintiffs point to Daniel Jones' $319.59 in wages for 28 hours of

recorded work for the week ending March 29, 2008. Plaintiffs also cite the GPS records for

Jones' company van which indicate that it was in operation for 51.73 hours that week. Plaintiffs conclude that, not counting the hours Jones worked prior to operating his van, Defendants only paid Jones $6.17/hour with no overtime premium for the 11.73 hours worked over 40 hours that week. Plaintiffs argue that Defendants do not respond to this argument, but Plaintiffs argument is unavailing. While Plaintiffs have demonstrated a gap between the hours worked by Jones as recorded and the hours recorded by the GPS program on his company van, Plaintiffs cite to no evidence, including testimony from Jones himself, to support the contention that the GPS records accurately recorded the number of hours that Jones worked that week. In fact, there is no evidence to show whether Jones used his company van only for work-related purposes that week. Given that Jones reported his own time, this is a significant omission. *See Amador v. Guardian Installed Serv., Inc.*, 575 F. Supp. 2d 924, 929 (N.D. Ill. 2008) (plaintiffs could not withstand summary judgment on their claim for overtime wages pursuant to the FLSA where plaintiffs made only "bare assertions" regarding failure to pay overtime wages and provided no factual support for their argument that the employers' program would inevitably result in pay below the minimum). Because there is a genuine issue of material fact for trial as to whether Defendants paid employees overtime wages as required by FLSA and IMWL, the Court denies Plaintiffs' motion for summary judgment.

## II.    Defendants' Motion for Summary Judgment

Defendants move for summary judgment with respect to three issues. First, Defendants contend that the FLSA preempts Plaintiffs' state common law claims. Second, Defendants assert that Plaintiffs have failed to adduce evidence to demonstrate to what extent Defendants subjected the absent class members to an unlawful wage and compensation policy. Third, Defendants

argue that, with regard to the FLSA and IMWL claims, Plaintiffs have failed to provide evidence of the number of hours Plaintiffs worked or to establish damages on an individual or class-wide basis. For the following reasons, the Court grants in part and denies in part Defendants' Motion for Summary Judgment.[3]

### A. Preemption of State Law Claims

Defendants first argue that the FLSA preempts Plaintiffs' state common law claims of quantum meruit, unjust enrichment, and breach of implied contract. The Seventh Circuit has explained the doctrine of federal preemption as follows:

> The central issue of this case is federal preemption, which occurs when a state law is invalidated because it conflicts with a federal law. The constitutional basis for federal preemption is found in the Supremacy Clause (Article VI, Clause 2 of the U.S. Constitution), which states, "[T]he Laws of the United States ... shall be the supreme Law of the Land [.]" Preemption comes in three forms. First, and the easiest to apply, is express preemption which occurs when Congress clearly declares its intention to preempt state law. Second, we have implied preemption which occurs when the "structure and purpose" of federal law shows Congress's intent to preempt state law. Finally, we come to conflict preemption which occurs when there is an actual conflict between state and federal law such that it is impossible for a person to obey both. *See English v. Gen. Elec. Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990).

*Mason v. SmithKline Beecham Corp.*, 596 F.3d 387, 390 (7th Cir. 2010). At issue here is implied preemption.

---

[3] Plaintiffs have moved to strike Defendants' incorporation of their brief in support of their motion for decertification into their memorandum in support of their motion for summary judgment. On June 22, 2010, the Court granted Defendants leave to file 35-page memorandum in support of each of their motions. (R. 172, Order.) Granting Defendants' request to incorporate their 35-page brief in support of their motion for decertification into their motion for summary judgment, however, would result in a brief in excess of the page limits imposed by the Court and would prejudice Plaintiff. The Court accordingly grants Plaintiffs' motion to strike.

Defendants contend that Plaintiffs' claims for unjust enrichment, quantum meruit, and breach of implied contract are "squarely based on rights established by the FLSA" and therefore preempted by FLSA's remedial scheme. The Court agrees.

On the other hand, Plaintiffs maintain that preemption does not apply to their state common law claims, yet the only cases Plaintiffs cite in support of this argument are cases that concluded that the FLSA does not preempt state *statutory* claims. These cases, however, do not address a situation in which plaintiffs have asserted state *common law* claims. In *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 589 F. Supp. 2d 1026, 103-31 (E.D. Wis. 2008), for example, the court held:

> It is clear that in enacting the FLSA, Congress did not explicitly preempt state wage and hour laws. Indeed, the FLSA contains a 'savings clause' that expressly allows states to provide workers with more beneficial minimum wages and maximum workweeks than those mandated by the FLSA itself. *See* 29 U.S.C. § 218(a) ("No provision of this chapter or of any order thereunder shall excuse noncompliance with any ... State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter...."). Given this express statement of Congress' intent not to displace state laws granting workers higher minimum wages or a shorter maximum workweek, it is clear that the FLSA would preempt only state laws that mandated lower minimum wages or longer maximum workweeks. Since the parties agree that the Wisconsin wage and hour laws . . . are not less generous than those of the FLSA, it seems clear that the FLSA does not displace the state law. Rather, it would seem that state law may offer an alternative legal basis for equal or more generous relief for the same alleged wrongs.

*Id.*

Conversely, Defendants' contention that the FLSA preempts state *common law* claims is well-supported by persuasive legal authority. In *Sorensen v. CHT Corp.*, No. 03 C 1609, 2004 WL 442638, at *6 (N.D. Ill. Mar. 10, 2004), for example, the court addressed whether the

26

plaintiffs could pursue state common law claims premised on the same facts as their FLSA claim

where they sought different remedies pursuant to the state common law claims. The court found:

> The court agrees that the Sorensen Plaintiffs have presented evidence that
> Defendants' tip credit arrangement was unjust in that waiters received only a
> fraction of their earned tips in violation of the FLSA, and is not persuaded by
> Defendants' belief that the allegedly "generous compensation package that
> amounted to roughly $70,000 on an annualized basis" establishes that they were
> paid fairly for their work as a matter of law. . . . Nevertheless, the Sorensen
> Plaintiffs' remedy is found in the FLSA and not the common law of quantum
> meruit. In *Johnston v. Davis Security, Inc.*, 217 F. Supp. 2d 1224, 1227-28 (D.
> Utah 2002), for example, the plaintiff filed suit for unpaid wages and overtime
> under the FLSA and also brought ten state common law claims, including one for
> unjust enrichment. *Id.* at 1226. The court dismissed the state law claims because
> they were based on the same facts and circumstances as the plaintiff's FLSA
> claims and, thus, were "barred as merely duplicative" of those claims. *Id.* at
> 1227-28. In this case, similarly, the Sorensen Plaintiffs concede that their unjust
> enrichment claim is based on the same factual assertions as their FLSA claims.
> As a result, the common law claim is preempted by the FLSA and not properly
> before this court.

*Sorensen*, 2004 WL 442638, at *6.

Several courts have followed the *Sorensen* court's reasoning and similarly held that the

FLSA preempts state common law claims. *See Nicholson v. UTi Worldwide, Inc.*, No. 3:09-cv-

722-JPG-DGW, 2010 WL 551551 (S.D. Ill. Feb. 12, 2010) ("If a state common law claim is

directly covered by the FLSA, the FLSA preempts that claim."); *Morgan v. SpeakEasy,*

*LLC*, 625 F. Supp. 2d 632, 659-60 (N.D. Ill. 2007) (plaintiff's "claim for unjust enrichment is

directly covered by the FLSA" and adopting the *Sorensen* court's analysis to bar plaintiff's claim

as preempted by the FLSA); *Choimbol v. Fairfield Resorts, Inc.,* No. 2:05 CV 463, 2006 WL

2631791, at *4-6 (E.D. Va. Sept. 11, 2006) (dismissing unjust enrichment claim where it

"merely recasts the central claim in this case: violation of the FLSA," and noting "Congress'

clear intent that the FLSA be the sole remedy available to employees for enforcement of

whatever rights he may have under the FLSA.") (internal quotations omitted). The Fourth

Circuit has similarly held that:

> Because the FLSA's enforcement scheme is an exclusive one, we further conclude that
> the Class Members' FLSA-based contract, negligence, and fraud claims are precluded
> under a theory of obstacle preemption. Our conclusion is consistent with the rulings of
> several district courts deeming state claims to be preempted by the FLSA where those
> claims have merely duplicated FLSA claims. *See, e.g., Choimbol v. Fairfield Resorts,
> Inc.,* No. 2:05cv463, 2006 WL 2631791, at *4-6 (E.D. Va. Sept. 11, 2006); *Moeck v.
> Gray Supply Corp.,* No. 03-1950, 2006 WL 42368, at *2 (D. N.J. Jan. 6, 2006); *Chen v.
> St. Beat Sportswear, Inc.,* 364 F. Supp. 2d 269, 292-93 (E.D.N.Y. 2005); *Morrow v.
> Green Tree Servicing, L.L.C.,* 360 F. Supp. 2d 1246, 1252-53 (M.D. Ala. 2005);
> *Sorensen v. CHT Corp.,* No. 03 C 1609(L), 2004 WL 442638, at *5-7 (N.D. Ill. Mar. 9,
> 2004); *Johnston v. Davis Sec., Inc.,* 217 F. Supp. 2d 1224, 1227-28 (D. Utah 2002);
> *Alexander v. Vesta Ins. Group, Inc.,* 147 F. Supp. 2d 1223, 1240-41 (N.D. Ala. 2001); *see
> also Roble v. Celestica Corp.,* No. 06-2934, 2006 WL 3858396, at *3 (D. Minn. Dec. 29,
> 2006) (suggesting that court would later deem state common law claims to be superseded
> by FLSA if discovery revealed that state claims were duplicative of FLSA claims);
> *Nettles v. tech plan Corp.,* 704 F. Supp. 95, 100 (D. S.C. 1988) (awarding summary
> judgment to employer on negligence claim as duplicative of FLSA claim, thereby
> implicitly ruling that negligence claim was FLSA-preempted). *But see Avery v. City of
> Talladega,* 24 F.3d 1337, 1348 (11th Cir. 1994) (allowing claim for breach of contract
> coterminous with FLSA claim); *Paukstis v. Kenwood Golf & Country Club, Inc.,* 241 F.
> Supp. 2d 551, 559-60 (D. Md. 2003) (concluding that state negligence claim did "not
> necessarily conflict with the purpose of the FLSA's remedial scheme, at least where a
> plaintiff seeks identical damages under both federal and state law").

*Anderson v. Sara Lee Corp.,* 508 F.3d 181, 194-95 (4th Cir. 2007).

Based on this significant body of persuasive authority, the FLSA preempts Plaintiffs'

state common law claims of unjust enrichment, quantum meruit, and breach of implied contract,

and the Court grants Defendants' motion for summary judgment at to Counts II, III, and IV of

Plaintiffs' Third Amended Complaint.

### B. Evidence to Support Claims of Absent Class Members

Defendants further argue that Plaintiffs have not presented any admissible evidence to

support the claims of absent class members, and therefore, request judgment against these

absentee class members. The Court will address this argument in the context of Defendants'
Motion for Decertification. Indeed, much of Defendants' argument cites to their memorandum
in support of their Motion for Decertification and the cases cited by Defendants are certification
rulings. Moreover, as discussed in detail below, the Court rejects this same argument in the
context of Defendants' Motion for Decertification.

Also, Defendants maintain that Plaintiffs' claims and theories of liability derive from
individual experiences rather than class-wide treatment and that the Named Plaintiffs' testimony
does not "implicate" any other technicians. As discussed in detail below, however, Plaintiffs
have identified company-wide policies and practices that resulted in Defendants' failure to
compensate Plaintiffs for work performed, and have also submitted an expert report opining on
the hours of off-the-clock work performed by class members. As the Court concludes below,
class treatment is therefore appropriate.

Finally, Defendants contend that there is no testimonial evidence from any individual
working at the Algonquin location, and thus request the Court to grant summary judgment on the
claims of individuals who worked out of the Algonquin location. Defendants, however, cite no
authority to support this argument. As the Seventh Circuit has instructed, "[i]t is not the
obligation of this court to research and construct legal arguments open to parties, especially
when they are represented by counsel," and we have warned that "perfunctory and undeveloped
arguments, and arguments that are unsupported by pertinent authority, are waived." *Judge v.
Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) (citations omitted). Also, Plaintiffs have identified
company-wide policies and practices that resulted in Defendants' failure to compensate Plaintiffs

29

for work performed.  The Court accordingly denies Defendants' motion for summary judgment in this respect.

### C.     FLSA and IMWL Claims

Next, Defendants seek summary judgment on Plaintiffs' FLSA claims and IMWL claims. Defendants contend that Plaintiffs have failed to establish the number of hours they worked and, consequently, cannot adduce evidence of their damages.  For purposes of their motion for summary judgment, Defendants presume, but do not concede, that Plaintiffs are entitled to the more favorable standard of proof the Supreme Court established in *Mt. Clemens*, 328 U.S. 680, discussed above.  As a result, Plaintiffs need only "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Id.*  "The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Id.*  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."  *Id.*

The non-controlling cases cited by Defendants in support of their argument are not persuasive.  In *Wood v. Mid-America Mgmt. Corp.*, 192 Fed. Appx. 378, 380, 2006 WL 2188706, at *2 (6th Cir. 2006), for example, the Sixth Circuit held that a single employee plaintiff did not sufficiently demonstrate that he fell within the ambit of 29 C.F.R. § 785.11. That FLSA regulation provides that "[w]ork not requested but suffered or permitted is work time" and that if "[t]he employer knows or has reason to believe that" an employee "is continuing to work," then "the time is working time."  *Id.*  The Sixth Circuit further held that the plaintiff's testimony that he did not keep any records of his overtime and that he "figured out

personally" that he worked, but did not report, an average of five hours plus per day was "a bridge too far." *Id.* The plaintiff also testified that, "I could not put [my] finger on the amount of time because I did it continuously," and "[t]here is no way ... that I can estimate the time I spent with people on a daily basis in the building that I can claim one minute for." *Id.*

On the other hand, Plaintiffs have adduced enough evidence to permit a reasonable jury to conclude that they have demonstrated the amount and extent of work performed by Plaintiffs by a matter of just and reasonable inference. Plaintiffs have provided declarations from each of the six Named Plaintiffs, who specifically aver to the total hours they worked per week. (R. 176-3, Exs. 14-19.) In addition, five of the six Named Plaintiffs submitted affidavits containing assertions regarding the approximate number of hours they worked off the clock each week. *Id.* Each of the Named Plaintiffs also specifically averred to each of the job functions that they performed during those hours. *Id.* This is unlike the unsupported and vague deposition testimony in *Wood.* Plaintiffs have also produced payroll reports and GPS records which they contend further support their claim for damages. Defendants take issue with the use of GPS reports to establish damages because Defendants maintain that the GPS reports do not document whether Plaintiffs used company vans for personal reasons. Given that Defendants have a policy in place prohibiting employees from using company vehicles for personal purposes, however, this is a question of fact for the jury.

The facts of this case are similar to those in *Brown v. Family Dollar Stores of IN, LP*, 534 F.3d 593, 597 (7th Cir. 2008). In *Brown*, the Seventh Circuit reversed a district court's summary judgment ruling for the defendant employer where "[t]he failure of the employer's time records to conform with the hours that Brown would have had to have been in the store further cast[ed]

31

doubt on the accuracy and adequacy of the employer's records under the FLSA." The Seventh

Circuit concluded that the "just and reasonable inference standard is appropriate" and noted that

the plaintiff employee sufficiently demonstrated the hours for which she was not compensated.

Specifically, the Seventh Circuit held:

> The holiday hours, as well as her testimony regarding the time it took to open and
> close the store, provide a basis for arriving at a just and reasonable inference as to
> the uncompensated hours. As noted above, there is evidence in the record that
> she was the only person able to open and close the store, and that she spent at
> least 1-2 hours before and after those store hours preparing the store for business.
> Comparison of the hours for which she was paid with the hours of operation for
> the store, would yield a basis for determining the amount and extent of work as a
> matter of just and reasonable inference. Accordingly, the district court erred in
> requiring Brown to provide definite and certain evidence of her damages, and the
> evidence establishes a genuine issue of fact concerning damages under the proper
> standard.

*Id.* at 597-98; *see also Harper v. Wilson,* 302 F. Supp. 2d 873, 882-83 (N.D. Ill. 2004) ("[s]ince

[plaintiff employee] can prove uncompensated work by his testimony, the burden of production

shifts to the Defendants to prove 'the precise amount of work performed or . . . evidence to

negative the reasonableness of the inference to be drawn from the employee's evidence'")

(internal citations omitted).

In sum, there is a genuine issue of material fact as to the sufficiency of Plaintiffs'

damages calculations and Defendants point to no evidence to rebut Plaintiffs' damages analysis

as required pursuant to *Mt. Clemens*, 328 U.S. 680. The Court accordingly denies' Defendants'

motion for summary judgment with respect to Plaintiffs' FLSA and IMWL claims.

## III. Defendants' Motion for Decertification

On December 30, 2008, the Court granted Plaintiffs' Motion for Class Certification and

certified the following class: "all individuals who were employed by DirectSat as service

32

technicians or production technicians in the state of Illinois between December 3, 2006 and June 11, 2008." (R. 40, Order.) In its December 30, 2008 order certifying Plaintiffs' proposed class, the Court found that Plaintiffs satisfied the numerosity, commonality, typicality, and adequacy of representation requirements of Federal Rule of Civil Procedure 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3). The Court denied reconsideration of its certification order on June 29, 2009. (R. 82, Order.) Defendants now request the Court to reconsider its certification ruling in light of the evidence the parties adduced during discovery. Defendants contend that they subjected Plaintiffs to variant wage and overtime policies and that, consequently, Plaintiffs cannot meet the typicality prong of Rule 23(a) or the predominance or superiority elements of Rule 23(b). The Court will address these arguments in turn.

### A.      Rule 23(a) Requirements

Defendants first contend that Plaintiffs cannot meet Rule 23(a)'s commonality and typicality requirements. As an initial matter, and as the Court noted in its ruling on the motion for certification, the Court need not consider the commonality element separate from its Rule 23(b)(3) predominance analysis below. *See Owner-Operator*, 231 F.R.D. at 282. With regard to typicality, under Rule 23(a)(3), "the typicality requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596-97 (7th Cir. 1993). A "plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232

(7th Cir. 1983); *Fletcher*, 245 F.R.D. at 336. The typicality requirement is liberally construed. *Gaspar v. Linvatec Corp.*, 167 F.R.D. 51, 57 (N.D. Ill. 1996).

In certifying the class, the Court noted that, "[b]ecause the individual Plaintiffs' claims arise from the same alleged practices giving rise to the other class members' claims and the claims are based on the same legal theories, the named Plaintiffs' claims satisfy the typicality requirement under Rule 23(a)(3)." (R. 40, Order at 5.) The Court specifically determined that the "named Plaintiffs' interests encompass the putative class members' interests based on Plaintiffs' allegations that DirectSat fails to pay its service technicians for certain tasks and directs its technicians to record less time than they actually worked." *Id.* Having had the benefit of discovery, Defendants now claim that the Named Plaintiffs' claims are not typical of the class because the "informal and supervisor-driven policies that each of the named Plaintiffs were respectively subject to wholly undermines the original rational for certification that Plaintiffs proffered in connection with their initial motion." (R. 183, Defs. Brief for De-Cert. at 20.) To support this contention, Defendants cite to deposition testimony from the Named Plaintiffs which demonstrates that each of the Named Plaintiffs had varying conversations with their supervisors and other unidentified individuals regarding the recording of time.

As Plaintiffs note in their response, however, the claims of the Named Plaintiffs and the class members all arise from the Defendants requiring allegedly off-the-clock work at the beginning of the day and end of the day. In fact, in their response to the motion for decertification, Plaintiffs cite evidence that establishes that each of the Plaintiffs performed the same "off-the-clock" work including: (i) driving to their initial job, (ii) driving home from their last job, (iii) unloading and loading Defendants' equipment, (iv) receiving daily assignments,

and (v) calling their first customer of the day. While the Named Plaintiffs have provided varying testimony pertaining to discrete discussions with their supervisors regarding the recording of their hours, Plaintiffs also point to evidence in the record that two executives testified that DirectSat told employees that arrival at the first customer job or the warehouse should mark the start of their work day on their time sheets. Plaintiffs also point to company-wide policies that require Plaintiffs to unload their vehicles each night and to testimony showing that DirectSat required technicians to call their first customer prior to leaving for the daily assignments. Moreover, a number of the Named Plaintiffs testified that they were instructed not to include drive time on their time sheets. In short, Plaintiffs have demonstrated that the Named Plaintiffs' claims are typical of the class members because they arise from the same practices and policies. *See, e.g., Russell v. Illinois Bell Tel. Co., Inc.*, ___ F.Supp.2d ___, 2010 WL 2595234, at *10-11 (N.D. Ill. 2010) ( motion to decertify FLSA class denied where the "plaintiffs across all call centers contend[ed] that coaches and trainers instructed them to be "open and available" at the start of their tours and "[t]he record sufficiently reflect[ed] that this practice was prevalent and involved more than just a few managers who failed to follow company policies").

The cases cited by Defendants are inapposite. Specifically, both cases involve decertification of a class where the plaintiffs premised their claims on purported miscommunications, but failed to demonstrate that those communications were typical of the class. In *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 597-98 (7th Cir. 1993), for example, the Seventh Circuit held that plaintiffs had not met the typicality of Rule 23(a)(3). In that case, the plaintiffs' primary claim was that the City communicated to pension recipients about the availability of effectively free lifetime health care and the recipients relied on those

communications. *See id.* at 597. The Seventh Circuit noted that "[i]t is not known whether the communications allegedly made by the City and the Funds to each group of city employees regarding the health care plan were identical" and "[t]he only evidence in the record pertains to police pre-retirement seminars and, even in that circumstance, it is not known whether the communications were uniformly made at every seminar." *Id.* The Seventh Circuit further explained that the plaintiffs "have not provided any evidence other than speculation that any alleged communications by the City or the Funds to the fire, laborer, or municipal annuitants were the same as those made to the police." *Id.*; *see also In re Sears Retiree Group Life Ins. Litig.*, 198 F.R.D. 487, 490 (N.D. Ill. 2000) (class claims were not typical because "looking at the total mix of statements received by each retiree, as ERISA case law dictates, we find that there is too much variation to permit class adjudication of the estoppel and breach of fiduciary duty claims"). Here, each of the Named Plaintiffs provides a declaration demonstrating that DirectSat subjected them to the same practices and policies that allegedly resulted in unreported and uncompensated work.

Defendants also argue that Plaintiffs and their attorneys are not adequate representatives pursuant to Rule 23(a)(4). The adequacy-of-representation requirement "is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Assoc.*, 7 F.3d at 598.

With respect to the adequacy of Plaintiffs, Defendants argue that the lack of typicality among the Plaintiffs' claims undercuts their ability to act as adequate class representatives. "Although a representative plaintiff need not immerse himself in the case[,] . . . the named

36

plaintiff must have some commitment to the case, so that the 'representative' in a class action is not a fictive concept." *Rand v. Monsanto Co.*, 926 F.2d 596, 598-99 (7th Cir. 1991) (internal citation omitted). As discussed above, Plaintiffs have claims that are typical of those brought by other class members, and there is no indication that their interests are inconsistent with those of other class members. *See Subedi v. Merchant,* No. 09 C 4525, 2010 WL 1978693, at *12-14 (N.D. Ill. May 17, 2010). Moreover, Defendants do not contest that Named Plaintiffs Gerald Farmer, Pompey Hicks, and Antwon Williams have submitted to depositions, participated in discovery, and actively assisted Plaintiffs' counsel. *See id.* They therefore have demonstrated that they are adequate representatives for the class.

Plaintiffs must also show that class counsel will adequately represent the class. While the Court has raised concerns regarding the propriety of certain actions on the part of Plaintiffs' counsel during the course of this lawsuit – and has in fact sanctioned Plaintiffs' counsel on two occasions – the Court's assessment of the adequacy of counsel requires consideration of their competency and any potential conflicts between class counsel and the class. *See Amchem Prods.,* 521 U.S. at 626 n.20, 117 S.Ct. at 2251. Defendants first highlight counsels' solicitation of a deponent. The Court, however, previously addressed this contention in its denial of Defendants' motion for reconsideration of the ruling granting class certification. The Court noted:

> In response to this conflict of interest, the Court required Plaintiffs' counsel to submit signed consent forms from the named Plaintiffs and to obtain independent counsel to cross-examine the individual with whom the conflict arose. Plaintiffs' counsel did so, and the Court denied DirectSat's motion to disqualify. (R. 58-1.) To the extent any potential conflict remains uncured, it is not an independent basis for reconsidering the grant of class certification.

(R. 82, Order at 5.)  Defendants also point to the Court's order sanctioning Plaintiffs for using discovery in this case to pursue another action, but do not address how these actions evidence a conflict.  Instead, Defendants argue that Plaintiffs' counsel are conflicted because Plaintiffs have objected to Defendants issuing subpoenas for supervisors identified by several Plaintiffs. Defendants contend that because of the supervisors' status as class members, Defendants cannot speak with the supervisors.  Significantly, however, Defendants do no contest that they withdrew the deposition notices for these supervisors and failed to raise the issue with the Court or Plaintiffs after doing so.  Indeed, Defendants have demonstrated that they know how to bring disputed issues before the Court.  In short, Defendants have not highlighted any actual conflict on the part of Plaintiffs' counsel.  Finally, Defendants do not disagree that class counsel has experience pursuing class action wage and hour cases.  *See Amchem Prods.*, 521 U.S. at 626 n.20, 117 S.Ct. at 2251.

> **B.      Rule 23(b)(3) Requirements**[4]

Defendants also assert that the allegedly "informal and variant policies" demonstrate that questions of law and fact predominate over questions affecting individuals and that therefore Plaintiffs cannot meet Rule 23(b)(3)'s predominance requirement.  Under Rule 23(b)(3), the

---

[4]      Defendants contend that the existence of the collective action mechanism under the FLSA precludes the Court from holding that the class action mechanism satisfies the superiority requirement under Rule 23(b)(3).   The Court has previously rejected this argument in ruling on Defendants' Motion for Reconsideration.  (R. 82-1, Order.)  Defendants posit that they "raise this argument again to preserve their rights and to ask this Court to re-examine its previous position in light of additional case law and analysis," but do not cite any additional case law since the Court's ruling.  Because motions to reconsider serve the limited function of allowing the Court to correct a manifest error of law or fact or to consider newly discovered material evidence, *see Sigsworth v. City of Aurora*, 487 F.3d 506, 507-08 (7th Cir. 2007), the Court denies Defendants' request to reconsider its earlier ruling.

Court must determine whether: (1) the questions of fact or law common to the class members predominate over questions affecting only the individual class members; and (2) a class action is superior to other available methods of adjudicating Plaintiffs' claims. Fed. R. Civ. P. 23(b)(3); *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). Rule 23(b)(3) includes a list of factors for courts to consider when evaluating the predominance and superiority criteria:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3); *see also Amchem*, 521 U.S. at 615-16.

As stated, Defendants challenge the predominance requirement. "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. To satisfy the predominance requirement, a plaintiff must demonstrate that common issues of law or fact predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3); *Szabo*, 249 F.3d at 676. "When determining if plaintiffs have met the predominance requirement, district courts focus on questions of liability, not damages." *Fletcher*, 245 F.R.D. at 332. If the liability issues would require individual and fact-intensive determinations, the class' common issues do not predominate. *Id.* To determine whether the liability issues are subject to class-wide proof, the Court examines such factors as the substantive elements of Plaintiffs' claims, the proof necessary for those elements, and the manageability of trial on those issues. *Id.*; *Radmanovich v. Combined Ins. Co. of Am.*, 216 F.R.D. 424, 435 (N.D. Ill. 2003).

Again, Defendants argue that discovery has shown that (i) no testimony depicts the deviation from formal DirectSat policies that occurred at the Algonquin office, (ii) Plaintiffs claim they were not subject to the formal DirectSat policy, and (iii) the direction given by low-level supervisors varied and gave rise to multiple informal policies. In the ruling granting class certification, however, the Court already considered that DirectSat, through supervisors of the Named Plaintiffs at varying office locations, may have encouraged some of, if not all, Plaintiffs to under-report hours. Although the Court recognized that this issue is not subject to class-wide proof, the Court found that class wide questions still predominate:

> To establish predominance, Plaintiffs must show that class-wide evidence will be used to prove that DirectSat failed to pay for certain work and is liable under Illinois law. The same evidence will be required to establish whether, as Plaintiffs allege, "Defendant's policy or practice to have plaintiffs work off-the-clock attending meetings and training, loading and unloading equipment, planning jobs, maintaining their vehicles and transporting equipment to and from those jobs violates Illinois wage law." (R. 33-1, Pls.' Reply in Supp. of Class Certification at 4.) For Counts II, III, and IV of their Complaint, Plaintiffs will be required to show that Plaintiffs and the putative class members conveyed a benefit to DirectSat for which they did not receive compensation.[] These claims are common to all class members because they concern how DirectSat pays its technicians for tasks that all technicians were allegedly required to complete. Those claims will be proven through common evidence, specifically DirectSat's policies regarding pay for such work for technicians and whether DirectSat technicians were required to perform some or all of the alleged unpaid tasks. While there may be factual differences between class members' claims, such as the amount of hours worked per week and what off-the-clock work was performed, those issues concern individual damages, which are not the focus of the predominance inquiry. Plaintiffs acknowledge that whether DirectSat "encouraged some if not all Plaintiffs to under-report the hours they worked" is not subject to class-wide proof. (*Id.*) The existence of factual or legal differences within a class, however, does not foreclose a plaintiff from establishing predominance. *See Patterson v. Gen. Motors Corp.*, 631 F.2d 476, 481 (7th Cir. 1980); *Fletcher*, 245 F.R.D. at 331-32; *Radmanovich*, 216 F.R.D. at 435 ("Although the common issues must predominate the case, it is not necessary that the plaintiff show them to be exclusive."). The class-wide questions of whether DirectSat is liable for wages related to these tasks and whether overtime was

improperly denied predominate over any individualized questions, including questions of damages. *See Ladegaard*, 2000 WL 1774091, at *7.

(R. 40, Order at 6-7.)

Discovery has shown that there are class-wide questions that predominate over individualized questions. While Plaintiffs have not identified specific written policies with regard to recording time before arriving at or subsequent to leaving a specific job, Plaintiffs have pointed to executive testimony evidencing the existence of such a policy. (R. 189, Pls. Resp. at 11.) In addition, Plaintiffs have pointed to Defendants' policies requiring technicians to call dispatch or the first customer of the day prior to arrival at the customer's location and to remove tools or equipment from the vehicles at the end of the day. Plaintiffs have further identified common evidence demonstrating that Defendants did not compensate the Named Plaintiffs for the same tasks: (i) driving to their first customer job, (ii) driving home from their last customer job, (iii) loading and unloading Defendants' equipment, (iv) receiving daily assignments, and (v) calling their first customer of the day.

Meanwhile, the case law relied on by Defendants is not persuasive. In *Johnson v. TGF Precision Haircutters, Inc.*, No. Civ.A. H-03-3641, 2005 WL 1994286, at *3 (S.D. Tex. Aug. 17, 2005), for example, the court denied certification of an FLSA class where it found that the evidence demonstrated varying experiences by different plaintiffs under different managers. The court explained:

> Johnson also cites declarations made by a handful of former TGF managers and/or supervisors. Some state that they required stylists and receptionists at their shop to arrive early, but did not clock them in until the salon opened-or that they clocked the stylists and receptionists out once the store closed, even if the employees were still working-because Tavakoli and/or the Manual required them to do so. *See, e.g., id.* ex. B exs. 17, 40. The policy of other managers was to have stylists and receptionists clock-in for the 15 minutes before the store opened

41

and to stay clocked-in when working late. These managers state they received complaints from their employees about shortages in their paychecks, but do not state how they resolved those complaints. *See id. exs.* 42-43.

*Id.*

Here, while Defendants stress the discrepancies in the Named Plaintiffs' testimony when they recounted discussions with their various supervisors, this testimony focuses on whether their supervisors encouraged Plaintiffs to under-report their hours. Plaintiffs have pointed to significant common evidence regarding Defendants' overarching policies. Indeed, as other courts have recognized:

> [S]ome district courts have held that a lawsuit involving allegations of an informal policy requiring off-the-clock work cannot be litigated collectively where a large number of plaintiffs were employed at many different locations and the decision to allow or require off-the-clock work was carried out by individual managers. This Court must respectfully disagree with the analysis in those decisions, which, of course, is not binding. It simply cannot be that an employer may establish policies that create strong incentives for managers to encourage or allow employees to work off-the-clock, and avoid a FLSA collective action because a large number of employees at a number of different stores are affected. To a certain extent, any large class of employees working for a nationwide employer alleging FLSA overtime violations will encounter these difficulties, and there is no indication that Congress intended section 216 to only allow small collective actions involving unpaid overtime to proceed.

*Falcon v. Starbucks Corp.*, 580 F. Supp. 2d 528, 539 -540 (S.D. Tex. 2008) (internal citations omitted). Similarly, in *Maynor v. Dow Chemical Co.*, 671 F. Supp. 2d 902, 931-32 (S.D. Tex. 2009), the court explained:

> In granting motions for decertification, many cases emphasize that class members were supervised by a variety of managers and worked in a variety of locations, stores, or offices. Such differences in the plaintiffs' employment settings were important because they affected the amount and type of off-the-clock time required. In the present case, the variations in amount and type of training did not depend on where the individual plaintiff worked in the plant or who his supervisor was.

*Id.*

Plaintiffs have presented evidence that each of the Named Plaintiffs assert that DirectSat did not pay them for the same type of work, notwithstanding their varying supervisors or locations. The Court therefore concludes "that there is a meaningful nexus that binds Plaintiffs' claims together and that the similarities in their claims outweigh their differences." *Falcon*, 580 F. Supp. at 540.

Because Plaintiffs have satisfied the necessary elements of Rule 23(a) and Rule 23(b)(3), the Court denies Defendants' Motion for Decertification.

## CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for Partial Summary Judgment, grants in part and denies in part Defendants' Motion for Summary Judgment, denies Defendants' Motion for Decertification, and grants Plaintiffs' Motion to Strike.

**Date:** October 4, 2010

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**

43