IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD FARMER, POMPEY HICKS, ANTWON WILLIAMS, individually, and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 08 CV 3962 |
| DIRECTSAT USA, LLC, JAY HEABERLIN, LLOYD RIDDLE, DAN YANNANTUONO, and UNITEK USA, LLC, | ) ) ) ) ) | Judge John Z. Lee |
| Defendants. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Defendants DirectSat USA, LLC ("DirectSat"), Jay Heaberlin, Lloyd Riddle, Dan Yannantuono, and Unitek USA, LLC (collectively "Defendants") seek to bar the expert testimony of Gerald A. Becker under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). For the following reasons, the Court grants Defendants' motion.

**Background**

On February 1, 2010, Plaintiffs, who worked as installation and service technicians at DirectSat installing satellite dishes and related equipment at private homes and commercial establishments, filed a Third Amended Complaint alleging that Defendants violated the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105, *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to fully compensate Plaintiffs for overtime

worked.[1]  Plaintiffs pursue their IMWL claims individually and on behalf of a class consisting of "all individuals who were employed by DirectSat as service technicians or production technicians in the state of Illinois between December 3, 2006 and June 11, 2008."  Plaintiffs pursue their FLSA claims individually.

In support of their case, Plaintiffs have offered Gerald A. Becker as an expert witness "to provide testimony that will assist the jury in assessing damages." (Pls.' Resp. 1.)  Becker is a retired investigator for the Department of Labor, Wage and Hour Division ("DOL"). (Defs.' Mem. to Preclude Test. of Gerald Becker, Ex. 1, Becker Dep. 13:1-3. ("Becker Dep."))  Prior to retiring in 2010, Becker investigated employers' compliance with the FLSA and other wage and hour laws for 35 years. (*Id.* 21:9-17, 22:10-17.)  His investigations consisted primarily of interviewing employees and reviewing payroll records. (*Id.* 30:6-31:8.)  He holds a bachelor's of arts degree from Valparaiso University with a double major in history and geography. (*Id.* 24:24-25:5.)

In this case, Becker submitted a report in which he opines that "violations of the FLSA have occurred" at DirectSat. (Defs.' Mem. to Preclude Test. of Gerald Becker, Ex. 2, Becker Report 3 ("Becker Report").)  Specifically, he concludes that the weekly timesheets submitted by installation and service technicians did not accurately reflect all of the hours the technicians worked because the timesheets did not capture time spent traveling between jobs, building satellite dishes at home, planning daily routes, helping other technicians, or reading faxes with daily assignments. (*Id.* 4, 7.)  He also concludes that the timesheets did not capture time spent attending weekly and monthly meetings at the DirectSat warehouse, restocking the van at the warehouse, preparing inventory lists of supplies needed, loading, unloading, and organizing the

---

[1] On October 4, 2010, the Court granted Defendants' summary judgment motion as to Plaintiffs' common law claims of unjust enrichment, quantum meruit, and breach of implied contract. *See Farmer v. DirectSat USA, LLC*, No. 08 C 3962, 2010 WL 3927640 (N.D. Ill. Oct. 4, 2010).

van, pre-calling the first customer of the day, cleaning and maintaining the van, and working in the warehouse on days when the technicians received no job assignments. (*Id.* 7-8.)

Becker concludes that the technicians chose to underreport their time because doing so helped them achieve a higher "productivity rating," calculated as weekly earnings divided by weekly hours worked. (*Id.* 5.) Becker concludes that employees with a productivity rating below DirectSat's standard rating could face retraining, suspension, and termination, whereas employees with a high productivity rating could be promoted or help their managers earn a higher bonus. (*Id.* 5.) Becker also concludes that technicians chose to underreport their hours because as their hours approached 40 hours in a week they would be given fewer jobs, which would result in lower pay, and because DirectSat discouraged employees from recording hours by requiring them to obtain permission before working overtime. (*Id.* 5, 8.)

To reach these conclusions, Becker reviewed the timesheet records of four DirectSat technicians, the depositions of seven DirectSat technicians, and three months of GPS data from thirty DirectSat technicians' vans. (Becker Dep. 147:13-148:12, 64:12-15; Becker Report 9.) Each DirectSat technician was issued a company van to drive to work sites during the day. (Becker Report 3.) Technicians were permitted to park the vans at their residences at night, so they often began and ended their work day at their homes. (*Id.*) In 2008, DirectSat equipped thirty of these vans with a GPS system that could track the van's location. (*Id.* 9.) Using three months of records from these GPS systems, Becker could identify when a technician's van was at his home and when it was not during that time period. (*Id.* 9.)

Using all of this information, Becker undertook to "reconstruct the true hours worked." (*Id.* 8.) First, using the GPS data, he calculated the time between the first and last movement of a technician's van each day ("GPS Time"). (*Id.* 9.) Based on his experience as a DOL

investigator, he found it "reasonable to conclude that the entire time [between the van's first and last movement] should be considered hours worked, since employees were not allowed to use the vans for their personal use."[2] (*Id.*) He then summed the daily GPS Time to arrive at a weekly total and compared that total to the total weekly hours the technician reported on his timesheet ("Reported Time"). (Becker Dep. 77.) Becker concluded that the difference between GPS Time and Reported Time represented the "off-the-clock" hours the technician worked. (*Id.* 79:3-11.)

Becker then calculated the average weekly "off-the-clock" hours for the thirty technicians over the three month period covered by the GPS data, and found an average of 31.43 "off-the-clock" hours for every two-week pay period. (*Id.* 79-80.) In addition, based on his review of seven technician depositions, Becker concluded that, during each two-week pay period, the technicians performed five additional hours of work (30 minutes per day for 10 days) outside of the time between the van's first and last movement of the day. (Becker Report 10.)

To calculate the total unrecorded hours worked per two-week pay period for each technician, Becker added the average "off-the-clock" hours, 31.43 hours, to the unrecorded non-GPS Time, 5 hours, to arrive at a total of 36.43 unrecorded hours for two-week pay period. (*Id.* 11.) To calculate total back wages, Becker applied these 36.43 hours to every two-week pay period in the class period for all 500 technicians and arrived at a total damages figure of $1,106,406.55. (*Id.* 12.) Defendants challenge Becker's opinions.

## Discussion

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the Supreme Court's seminal case *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). By its terms, Rule 702 allows the admission of testimony by an "expert," someone with the

---

[2] Becker did not deduct any time for meal breaks during the day because he concluded, based on his review of four employee depositions, that all DirectSat technicians ate while driving. (*Id.* 9.)

requisite "knowledge, skill, experience, training, or education," to help the trier of fact "understand the evidence or determine a fact in issue." Fed. R. Evid. 702. Experts are only permitted to testify, however, when their testimony is (1) "based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Id.*

*Daubert* requires the district court to act as the evidentiary gatekeeper, ensuring that Rule 702's requirements of reliability and relevance are satisfied before allowing the finder of fact to hear the testimony of a proffered expert. *See Daubert*, 509 U.S. at 589; *see also Kuhmo Tire Co. v. Carmichael*, 526 U.S. 137, 147-49 (1999); *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). District courts have broad discretion in determining the admissibility of expert testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Lapsley*, 689 F.3d at 810 ("we 'give the district court wide latitude in performing its gate-keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable'") (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)).

Before admitting expert testimony, district courts employ a three-part analysis: (1) the expert must be qualified as an expert by knowledge, skill, experience, training, or education; (2) the expert's reasoning or methodology underlying his testimony must be scientifically reliable; and (3) the expert's testimony must assist the trier of fact in understanding the evidence or to determine a factual issue. *Bielskis*, 663 F.3d at 893-94. "The purpose of the *Daubert* inquiry is to scrutinize the proposed expert witness testimony to determine if it has "'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury." *Lapsley*, 689 F.3d at 805 (quoting *Kumho Tire Co.*, 526 U.S. at 152). The proponent of the expert bears the burden of demonstrating that the

expert's testimony would satisfy the *Daubert* standard by a preponderance of the evidence. *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

Defendants argue that Becker is not qualified to be an expert, his methodology is unreliable, and his opinions would not assist a jury. The Court addresses each argument in turn.

**I.      Becker's Qualifications**

"Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010). Here, there is a mismatch.

Becker's testimony focuses on (1) reconstructing the "true hours worked" by DirectSat's technicians using GPS data, and (2) calculating the total unpaid compensation based on that reconstruction.[3] To reconstruct the "true hours worked," however, Becker does not analyze GPS data for all 500 DirectSat technicians over the whole 16-month class period. Instead, he relies on GPS data from thirty technicians over a three-month period. (Becker Dep. 147:13-148:12, 64:12-15; Becker Report 9.) He then extrapolates his findings based on this sample to all 500 DirectSat employees for the entire 16-month class period. Based on that extrapolation, he calculates total unpaid compensation.

---

[3] Becker is not the first expert Plaintiffs have put forth to opine on damages in this case. On June 14, 2010, Oran Clemons, also a former DOL investigator, submitted a preliminary expert report in which he calculated DirectSat's "minimum wage and overtime back wage liability." *See* Defs.' Mot. to Preclude Expert Testimony of Oran Clemons, Dkt. 251, Ex. 2 Preliminary Expert Report of Oran Clemons 20. On November 9, 2011, however, Plaintiffs informed the Court that Clemons had died. *See* Pls.' Mot. Terminate *Daubert* Hearing, Dkt. 283. In his report, Becker states that he "agree[s] with Mr. Clemons' analysis," including Clemons' "methodology of making his calculations" and his "conclusion regarding the number of unreported hours worked." (Becker Report 9, 12.) Because an expert witness must stand on his own and not simply serve as a mouthpiece for the opinions of others, however, *see Dura Auto Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002), the Court analyzes Becker's testimony, including all analysis and methodology, on its own, even if Becker adopted the analysis or methodology originally constructed and performed by Clemons.

At its core, Becker's opinions are based upon a statistical sampling analysis whereby he employs a purportedly representative sample (here, 30 technicians) for the purpose of extrapolating to the entire population (all 500 technicians). *See Utah v. Evans*, 536 U.S. 452, 465-467 (2002) (describing statistical sampling). This type of analysis, however, is not the area in which Becker has superior knowledge, skill, experience or education. Becker is a retired 35-year DOL investigator with experience investigating FLSA compliance. (Becker Dep. 6, 13:1-12, 23.) He has a bachelor's of arts degree with a double major in history and geography. (*Id.* 24:24-25:5.) Becker has never taken any college courses or completed any post-graduate work in mathematics or statistics. (*Id.* 25:13-16.) He has never received any training in statistics or in designing valid scientific samples from which conclusions about a larger population can be drawn. (*Id.* 25:13-16, 26:12-27:2) He does not consider himself an expert in designing scientifically valid samples, and he has never published any articles or books, contributed to any journals or trade publications, or edited or served as a reviewer of any publications related to statistical sampling. (*Id.* 27.) In addition, he has never been qualified as an expert by any court to provide opinion testimony about the damage methodology he employs here. (*Id.* 9:7-11, 82:24-83:10.) In his work as a DOL investigator, he primarily interviewed employees and reviewed payroll records. (*Id.* 30:6-31:8.) He did not design scientifically valid samples from which conclusions about larger populations could be drawn. (*Id.* 41:3-15.) Thus, he is not qualified to provide expert testimony based on the statistical sampling analysis and subsequent mathematical calculations he provides in this case.

II. **The Reliability of Becker's Methodology**

Becker's testimony cannot be presented to the finder of fact for the additional reason that he has failed to demonstrate that he used a reliable methodology. In determining reliability, the

Court must determine whether an expert's opinions are grounded in the methods and procedures of science, and whether the opinion has sufficient factual underpinnings. *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 608 (7th Cir. 2000). Becker has failed to demonstrate that his data and analysis are grounded in the methods and procedures of science.

### A. Data

As an initial matter, Becker has failed to demonstrate that the data upon which he relies are reliable or provide sufficient factual underpinnings for his testimony. First, there is no evidence that the GPS data, technician depositions, or employee timesheets used by Becker provide a random sample of the class. As the Court of Appeals has cautioned, a "non-random sample might undermine the reliability of the statistics." *Chavez v. Ill. State Police*, 251 F.3d 612, 643 (7th Cir. 2001); *see also U.S. v. Johnson*, 185 F.3d 765, 769 (7th Cir. 1999) ("the samples themselves . . . are problematic [because] they were not selected randomly from a larger pool of subjects; thus, this was an instance of nonprobability sampling"); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 932 (7th Cir. 1993) (noting that the failure to examine a random sample of work records prevented the proffered statistics from demonstrating a pattern of racial discrimination).

In his report, Becker notes that "[s]tarting in approximately February 2008, DirectSat installed GPS systems in the vans of about 30 technicians." (Becker Report 9.) But Becker has "no idea" how or why DirectSat selected those 30 technicians. (Becker Dep. 52:20-22.) DirectSat could have installed GPS systems in the vans of the 30 technicians believed to be the laziest at the company to gather evidence of shirking. Presumably, the GPS data from these 30 vans would show fewer hours worked than the average DirectSat technician. Alternatively, DirectSat could have installed GPS systems in the vans of the 30 technicians believed to be the

8

most industrious at the company to document and reward their efforts. Presumably, the GPS data from these 30 vans would show greater hours worked than the average DirectSat technician. In either scenario, the GPS data from the 30 technicians whose vans were equipped with GPS systems would not provide a representative sample from which Becker could reliably draw class-wide conclusions.

Similarly, the GPS data upon which Becker relies covers only three months, March 14, 2008 through June 11, 2008. (*Id.* 52:7-9.) Becker does not know why those three months were selected, but he does acknowledge that DirectSat technicians experience seasonal fluctuations in work with "the heavier period of work [in] late summer, early fall, prior to the NFL season." (*Id.* 52:13-19, 53:13-23.) Just as a non-random selection of technicians could impact the reliability of extrapolating results from 30 to all 500 technicians, so too could the non-random selection of the time period impact the reliability of extrapolating results from three months to the entire sixteen-month class period. For data to be reliable, both the "who" and "when" matter.

The same concerns apply to the technician depositions and timesheets upon which Becker relies. Becker reviewed depositions from seven technicians and timesheets from four technicians, but the class consists of 500 technicians. (*Id.* 64:12-14, 147:20-24.) There is no evidence that the employees deposed were randomly selected or that the timesheets Becker obtained from Plaintiffs' counsel were randomly chosen.

Despite these concerns, Becker conducts no analysis to test the reliability of the data he uses or to demonstrate the appropriateness of extrapolating results from this data to all plaintiffs for the entire class period. He admits that he did not collect the GPS data, identify the technicians to depose, or decide which employees' timesheets to pull for review in a systematic or scientific manner. (Becker Report 9, Becker Dep. *Id.* 26:2-17, 41:16-42:6, 147:9-24, 108:21-

9

110:2.)  It could well be that the sampling data are indeed representative, or it could be that the particular depositions and timesheets were hand-picked by Plaintiffs' counsel to maximize the strengths of Plaintiffs' case.  There is no way to know, and therein lies the deficiency.  *See Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 774 (7th Cir. 2013) (finding testimony from 42 "representative" members of a proposed class an insufficient basis for drawing class-wide conclusions because class counsel could not explain "how these "representatives" were chosen – whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify damages sought by the class"); *see also Victory Records, Inc. v. Virgin Records Am., Inc.*, No. 08 C 3977, 2011 WL 382743, at *4 (N.D. Ill. Feb. 3, 2011) (excluding testimony where expert selected sample "based not on his own expertise or analysis, but at the direction of [Plaintiff's CEO and owner].")

Additionally, Becker runs no tests, calculates no confidence intervals, and provides no margins of error to demonstrate how the sample GPS data he received is representative of those technicians and time periods for which he does not have GPS data.  (*Id.* 109-10.)  He also provides no analysis to confirm that the experiences of the seven technicians whose depositions he was provided are representative of the other 493 technicians' experiences.  (*Id.*)  Becker's failure to demonstrate the appropriateness of his sample casts further doubt as to its reliability.  *See Espenscheid*, 705 F.3d at 774 (testimony from 42 "representative" members of a proposed class an insufficient basis for drawing class-wide conclusions because "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members"); *Allgood v. Gen. Motors Corp.*, No. 102CV1077, 2006 WL 2669337, at *10-11 (S.D. Ind. Sept. 18, 2006) (expert testimony excluded where "samples [were not] chosen using some method that assures the samples are appropriately representative"); *Loeffel Steel Prods., Inc. v.*

10

*Delta Brands, Inc.*, 387 F. Supp. 2d 794, 811-12 (N.D. Ill. 2005) (excluding testimony where expert did not articulate an adequate basis for selecting the comparables used in the lost profits calculation).

Analysis as to the representative nature of the sampling data is particularly important here because the sample size of GPS data Becker uses and the number of depositions and timesheets he reviews is small. Although "[d]etermining the minimum sample size from which reliable extrapolations can be made to the sampled population is tricky," *DeKoven v. Plaza Associates*, 599 F.3d 578, 581 (7th Cir. 2010) (citing Floyd J. Fowler, Jr., *Survey Research Methods* 45 (4th ed. 2008)), a small sample size can detract from the value of statistical evidence. *See Teamsters v. United States*, 431 U.S. 324, 340 n.20 ("Considerations such as small sample size may, of course, detract from the value of [statistical] evidence"); *Mayor of City of Philadelphia v. Educ. Equality League*, 415 U.S. 605, 621 (1974) ([T]he District Court's concern for the smallness of the sample presented by the 13-member Panel was . . . well founded").

Here, Becker relies on three months of GPS data from 30 DirectSat technicians' vans, seven technicians' depositions, and timesheets from four technicians to draw conclusions about 500 technicians over a 16-month class period. (Becker Dep. 52:7-12.) He has conducted no analysis to demonstrate that GPS data from 6% of the technicians for less than 20% of the class period, deposition testimony from less than 2% of the technicians, and timesheets from less than 1% of the technicians provide a sufficiently large sample from which to draw conclusions about all plaintiffs for the entire class period. In sum, Becker has failed to establish the reliability of his data, as it is his burden to do. *See Lewis*, 561 F.3d at 705.[4]

---

[4] Defendants argue in a footnote that the GPS data are inadmissible because the data were produced to Plaintiffs pursuant to a third-party subpoena, and are therefore unauthenticated. (Def.'s Br. 5 n.7.) Defendants fail to develop this argument, however, and the argument is considered waived. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

### B. Methodology

Becker has also failed to establish the reliability of the assumptions and applications of his methodology. For example, using the GPS data, Becker identifies the first and last movement of the technicians' vans each day. (Becker Report 9.) He assumes that the entire time between the first and last movement constitutes hours worked. (*Id.*) He takes out no time between a van's first and last movement of the day for meals, breaks, or any other time when a technician might not have been working. (*Id.*) In fact, he ignores all GPS data between the first and last movement, even though that data contain information on midday stops and starts, including midday stops and starts back at technicians' homes. (Becker Dep. 45:15-46:15, 119:2-120:8.) Indeed, when presented at his deposition with an example of a technician whose GPS data showed a more than two-hour midday stop at the technician's own house, Becker said that such data did not raise any concerns about his methodology because "employees did work at their residences" and "the conclusion is that this is worked time." (*Id.* 120:12-121:13.) When asked if the employee could have been sleeping during that time at home, Becker responded that "[m]y methodology is concluding that all this is hours worked. So I don't take into consideration then that he was sleeping or might have been sleeping I should say." (*Id.* 122:20-23.)

This assumption is fatally flawed. As Becker himself acknowledged, a technician could have engaged in "any number" of non-work related activities between the van's first and last movement. (*Id.* 122:5-6.) Using the GPS data, as Becker further acknowledged, "there's just no way of knowing what anybody is doing at any time." (*Id.* 123:15) The self-serving assumption that the technician was working is not a scientific determination that has "the same level of intellectual rigor that characterizes the practice of an expert . . . so as to be deemed reliable

enough to present to a jury." *Lapsley*, 689 F.3d at 805 (internal quotations omitted). Indeed, this Court has previously recognized the flaw of such an assumption:

> Plaintiffs also cite the GPS records for [a technician's] company van which indicate that it was in operation for 51.73 hours that week. . . While Plaintiffs have demonstrated a gap between the hours worked by [the technician] as recorded and the hours recorded by the GPS program on his company van, Plaintiffs cite to no evidence, including testimony from [the technician] himself, to support the contention that the GPS records accurately recorded the number of hours that [the technician] worked that week. In fact, there is no evidence to show whether [the technician] used his company van only for work-related purposes that week.

*Farmer v. DirectSat USA, LLC*, No. 08-3962, 2010 WL 3927640, at *13 (N.D. Ill. Oct. 4, 2010). Thus, Becker has failed to demonstrate that his continuous-work assumption is reliable.

Becker's application of his methodology is also flawed. As stated, Becker assumes the time between a van's first and last movement constitutes the "true" hours a technician worked. (Becker Dep. 124:9-15.) For each of the 30 technicians in the GPS data, Becker then subtracts the hours the technician reported having worked in a week from the "true" hours recorded by the GPS data that week to calculate the "off-the-clock" hours the technician worked. (*Id.* 79:3-11.) He then calculates the average "off-the-clock" hours in a two-week pay period across all 30 technicians for the 3 months of GPS data and arrives at 31.43 hours. (*Id.* 79:8-20.) Finally, Becker adds this number, 31.43 hours, to the time of all 500 technicians for each two-week pay period in the 16-month class period.[5] (*Id.* 80:15-17.)

But Becker conducts no analysis to identify situations where applying these 31.43 hours might not be appropriate. For example, in one two-week period, a technician reported working *more* hours than the GPS data recorded. (*Id.* 87:15-17.) Becker nevertheless added the extra

---

[5] Becker also adds 5 hours to each two-week pay period to account for "unrecorded hours worked . . . by the technicians at their homes either at the beginning or end of the work day." (Becker Report 10.) Thus, in total, he adds 36.43 hours to each technician's hours for every two-week pay period in the class.

13

31.43 hours to that technician for that two-week period even though his analysis is premised upon the assumption that the GPS time is the "true time" worked and the 31.43 additional hours are intended to compensate for situations where technicians reported *less* time than the GPS data recorded. (*Id.*) Becker simply ignored this misapplication of his methodology and conducted no analysis to try to identify similar situations where applying the additional hours might not be appropriate. (*Id.* 89:1-18.)

In other instances throughout his analysis, Becker simply made mistakes. For example, in one document he received that listed the hours technicians recorded, a technician recorded working 78 hours in a particular two-week pay period. (*Id.* 91:19-92:7.) Yet on the document that Becker used to calculate the difference between recorded hours and GPS hours, the technician's recorded hours for that pay period was listed as 18. (*Id.* 91:13-15.) Becker admitted that this was a mistake. (*Id.* 92:6-7.) This mistake inflated an input into his calculation of his 31.34 hours benchmark by 60 hours, which in turn materially inflated the benchmark itself, which Becker then applied across the entire class. (*Id.* 92:12-17.) Becker claims that he "spot checked" the data to try to catch these types of errors, but his spot-checking analysis was not systematic and failed to catch even basic errors. (*Id.* 71:16-72:1.)

In response, Plaintiffs argue that these problems go to the weight of Becker's testimony, not its admissibility. (Pls.' Resp. 8-12.) But as the Supreme Court noted in *Daubert*, "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." 509 U.S. at 595. The Supreme Court held that the district court must "serve[] a "gatekeeping" function to prevent expert testimony from carrying more weight with the jury than it deserves." *U.S. v. Ozuna*, 561 F.3d 728, 736 (7th Cir. 2009) (citing *Daubert*, 509 U.S. at 595; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). Although "shaky" expert testimony may be

admissible, subject to attack on cross-examination, *see Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 762 (7th Cir. 2010), unreliable testimony is inadmissible. *See Bielskis*, 663 F.3d at 894. Indeed, unreliable testimony is the very testimony that a district court, acting in its gatekeeping role, is charged with excluding. *See Am. Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 818-19 (7th Cir. 2010). Becker's failure to utilize the methods of scientific statistical sampling or conduct any systematic analysis designed to demonstrate the reliability of his methodology and data renders his testimony not simply shaky, but unreliable.

In sum, Becker has failed to show that his analysis is based upon sufficient facts or data, the product of reliable principles and methods, and that he has applied the principles and methods reliably to the facts of the case. *See* Fed. R. Evid. 702. Consequently, his testimony regarding damages is not sufficiently reliable to be presented to the finder of fact.

**III.    Legal Conclusions**

Finally, Becker's testimony is inadmissible because it contains improper legal conclusions. An expert's testimony must "assist the trier of fact in understanding the evidence or to determine a factual issue." *Bielskis*, 663 F.3d at 893-94. "Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepard Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003). Here Becker's report contains numerous legal conclusions. For example, Becker concludes that "[m]y review and analysis of the records and documents in this case discloses that violations of the FLSA have occurred." (Becker Report 3, 12, 13.) Becker also concludes that "no overtime exemptions [from FLSA requirements] could be applied" to DirectSat employees. (*Id.* 11.) These are legal conclusions that are inappropriate for expert testimony.

**Conclusion**

For the reasons herein, the Court grants Defendants' motion to exclude the expert testimony of Gerald A. Becker [293]. Accordingly, Defendants' motion to strike the purported report addendum of Gerald A. Becker [308] is stricken as moot.[6]

**SO ORDERED**                                    **ENTER: 3/22/13**

_____
**JOHN Z. LEE**
**U.S. District Judge**

---

[6] In any event, the purported report addendum is untimely and does not cure the fatal flaws of Becker's testimony. On October 1, 2012, Plaintiffs served Defendants' counsel with an unsigned, one-page document entitled "Becker Report Addendum." *See* Defs.' Mem. Strike Addendum of Gerald A. Becker, Ex. A, Becker Report Addendum. First, Plaintiffs submitted this document nearly five months after expert discovery closed on May 11, 2012, and four months after the parties reported that discovery was completed and that they were ready for trial on June 21, 2012. *See* Dkt. 287, 301. Second, the document does not fix the fatal flaws of Becker's testimony. The document states that Becker "revised [his] damage calculations . . . to correct certain errors found in the previous computations." *Id.* Specifically, Becker "corrected [] previous transcription errors" and "made substantial corrections in the GPS work week computations" because "[f]or approximately 15 employees, the GPS records were incorrectly labeled as being in the year 2012, instead of 2008" which caused the "calculation of the GPS hours for those workweeks [to be] incorrect." *Id.* Becker also revised the damage computation to "eliminate additional employees who were either in training or in light duty status." *Id.* After making these changes, he calculated total back wages to be $1,013,735.05 (*Id.*), instead of $1,106,406.55 as he calculated in his original report. (Becker Report 12.) None of these changes address Becker's lack of qualifications, his failure to demonstrate the random selection or sufficient size of his sample, his failure to rely on scientific assumptions, and his failure to systematically or scientifically review the data for errors or anomalies that might render the application of his methodology inappropriate.