IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD FARMER, POMPEY HICKS, ANTWON WILLIAMS, individually, and on behalf of all others similarly situated, and STEVEN EMLING, SILAS JUNIOUS, and ODELL STIFFEND, individually, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 08 CV 3962 |
| DIRECTSAT USA, LLC, JAY HEABERLIN, LLOYD RIDDLE, DAN YANNANTUONO, and UNITEK USA, LLC, | ) ) ) ) | Judge John Z. Lee |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Gerald Farmer, Pompey Hicks, Antwon Williams, Steven Emling, Silas Junious, and Odell Stiffend (collectively "Named Plaintiffs") are former installation and service technicians at DirectSat USA, LLC ("DirectSat"). They sued DirectSat, Jay Heaberlin, Lloyd Riddle, Dan Yannantuono, and Unitek USA, LLC, (collectively "Defendants") alleging that Defendants violated the Illinois Minimum Wage Law ("IMWL"), 820 ILCS § 105, *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, by failing to pay technicians for all of the time they were required to work.[1] On December 30, 2008, pursuant to Federal Rule of Civil Procedure 23, the Court certified an IMWL class of "all individuals who were employed by DirectSat as service technicians or production technicians in the state of Illinois between December 3, 2006 and June 11, 2008." *See* Dkt. 40. Defendants now move to decertify that

---

[1] On October 4, 2010, the Court granted Defendants' summary judgment motion as to Plaintiffs' common law claims of unjust enrichment, quantum meruit, and breach of implied contract. *See Farmer v. DirectSat USA, LLC*, No. 08 C 3962, 2010 WL 3927640 (N.D. Ill. Oct. 4, 2010).

1

class, arguing that the Seventh Circuit's recent decision in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), requires decertification. For the following reasons, the Court agrees and grants Defendants' motion.

## Facts

As set forth in the Court's previous orders, DirectSat provides fulfillment installation services to DirectTV, a satellite television provider. *See Farmer*, 2010 WL 3927640, at *3. At its field offices, DirectSat employs managers, field supervisors, and technicians. *Id.* During the class period, DirectSat maintained field offices in Bedford Park, Bolingbrook, and Algonquin, Illinois. *Id.* Farmer, Hicks, and Stiffend worked out of the Bedford Park field office, and Williams, Emling, and Junious worked out of the Bolingbrook field office. *Id.*

Plaintiffs worked as full-time satellite technicians, driving company-assigned vans bearing a DirectTV logo to private homes and commercial establishments to install and service satellite dishes and related equipment. *Id.* DirectSat permitted them to park the vans at their residences at night, so they often began and ended their work day at their homes. *Id.* Each day, DirectSat sent job assignments to their homes via facsimile or email that they would review prior to planning their route for the day. *Id.*

DirectSat compensated technicians on a piece-rate basis – so many dollars per job – rather than a fixed hourly wage. *Id.* at *4. To ensure this compensation complied with federal and state law, which mandate a minimum wage for every hour worked and a wage 1.5 times the regular hourly wage for every hour worked in excess of 40 hours per week, DirectSat required technicians to report hours worked on weekly timesheets. *Id.* DirectSat divided the amount earned through the piece-rate system by the technician's reported hours worked to calculate an effective hourly wage. *Id.* If that wage was below the applicable federal or state minimum

wage, DirecSat adjusted the hourly rate so that the technician received the appropriate minimum wage. *Id.* If the technician worked more than forty hours in a week, DirectSat paid the technician for that time at a rate equal to his effective hourly wage multiplied by 1.5. *Id.*

Plaintiffs allege that DirectSat failed to pay them for all the work they performed by prohibiting them from recording time worked before they arrived at their first job of the day and after they left their last job of the day. They allege that before going to the day's first job, they spent time receiving daily assignments, calling the first customer, loading the van, and driving to the first job. After leaving the day's last job, they allege that they spent time unloading tools from their van.

On December 30, 2008, the Court certified an IMWL class of approximately 512 technicians. *Id.* at *8; (Dkt. 91, Ex. 2, Decl. Vincent P. Harnett, ¶ 5.) After the close of fact discovery, Defendants moved to decertify the class, but on October 4, 2010, the Court denied Defendants' motion. *See Farmer*, 2010 WL 3927640, at *24. Now, Defendants again move to decertify the class.

## **Discussion**

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Indeed, "a favorable class determination by the court is not cast in stone." *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130, U.A.*, 657 F.2d 890, 869 (7th Cir. 1981). "If the certification of the class is later deemed to be improvident, the court may decertify." *Id.* On a motion to decertify a class, the party seeking class certification "bears the burden of producing a record demonstrating the continued propriety of maintaining the class action." *Ellis v. Elgin Riverboat Resort*, 217 F.R.D. 415, 419 (N.D. Ill. 2003).

In general, "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores Inc. v. Dukes*, 131 S.Ct. 2541, 2550 (2011) (internal citations and quotations omitted). To justify a departure from that rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (internal quotations omitted). "Rule 23(a) ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate." *Id.*

To be certified under Rule 23(a), a proposed class must satisfy each of the rule's four requirements: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

If Rule 23(a) is satisfied, a proposed class must fall within one of the three categories in Rule 23(b), which the Seventh Circuit has described as: "(1) a mandatory class action (either because of the risk of incompatible standards for the party opposing the class or because the risk that the class action adjudication would, as a practical matter, either dispose of the claims of non-parties or substantially impair their interests), (2) an action seeking final injunctive or declaratory relief, or (3) a case in which the common questions predominate and class treatment is superior." *Spano*, 633 F.3d at 583.

"Rule 23 does not set forth a mere pleading standard." *Dukes*, 131 S.Ct. at 2551. "On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 811 (7th Cir. 2012). Rather, the named plaintiff bears the burden of showing that a proposed class satisfies

4

each requirement of Rule 23 by a preponderance of the evidence. *Id*. "Failure to meet any one of the requirements of Rule 23 precludes certification of a class." *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993). Moreover, certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Dukes*, 131 S.Ct. at 2551.

Finally, although "as a general principle, a court is not allowed to engage in analysis of the merits in order to determine whether a class action may be maintained [,] . . . the boundary between a class determination and the merits may not always be easily discernible." *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598-99 (7th Cir. 1993) (internal citations and quotations omitted). Consequently, "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.*; *see also Dukes*, 131 S.Ct. at 2551 (class certification analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim"). As the Seventh Circuit has held, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see Kartman v. State Farm Mut. Auto. Ins. Co.*, 634 F.3d 883, 889-90 & n.6 (7th Cir. 2011).

Here, Plaintiffs contend that the class satisfies all four Rule 23(a) requirements and the requirements of Rule 23(b)(3). Defendants, in turn, argue that because Plaintiffs seek damages under Rule 23(b)(3), the Seventh Circuit's recent decision in *Espenscheid* requires decertification. The Court agrees.

In *Espenscheid*, 2,341 DirectSat installation and service technicians sued DirectSat for failing to pay them for all of the time they were required to work in violation of state wage and overtime laws and the FLSA. 705 F.3d at 772-73. As here, the technicians were paid on a piece-rate basis, not a fixed hourly wage, but were required to report the time they worked. *Id*. They alleged DirectSat forbid them from recording time spent on certain tasks such as calling customers, filling out paperwork, and picking up tools from the company's warehouses. *Id.*

On February 4, 2013, the Seventh Circuit affirmed decertification of the class because Plaintiffs sought damages and determining damages would have "require[d] 2341 separate evidentiary hearings," and was thus not suitable for class treatment. *Id.* at 773-777. The Court concluded that determining damages required individualized inquiries because DirectSat technicians varied in how much they worked, how efficiently they worked, and how they recorded time. *Id.* The Court noted that "it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45-hour week (unless he missed one or more days because of illness or some other reason) but was paid no overtime." *Id.* at 773. If that was the case, the Court reasoned, "each technician's damages could be computed effortlessly, mechanically, from the number of days he worked each week and his hourly wage," and "when 'it appear[s] that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program . . . the district court can award relief without terminating the class action and leaving the class members to their own devices.'" *Id.* (quoting *Johnson v. Meriter Health Servs. Emp. Ret. Plan*, 702 F.3d 364, 372 (7th Cir. 2012)). But, the Court held, "[n]othing like that is possible here." *Id.* Because technicians were paid on a piece-rate system and "workers differ in their effort and efficiency," the Court found that "some, maybe many, of the technicians may not work more than 40 hours a week and may even

6

work fewer hours; others may work more than 40 hours a week." *Id.* at 773. Additionally, technicians performed "different tasks" and did not uniformly report the time they spent on those tasks. *Id.* at 773-74.

To overcome this "problem of variance," the *Espenscheid* Plaintiffs proposed presenting testimony at trial from 42 "representative" members of the class. *Id.* at 774. The Seventh Circuit found, however, that "[c]lass counsel has not explained in his briefs, and was unable to explain to us at the oral argument though pressed repeatedly, how these 'representatives' were chosen – whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class." *Id.* Because there was "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members," the Court held that the 42 individuals were not representative of the class and, therefore, could not serve as a benchmark from which classwide damages could be extrapolated. *Id.*

The Court further held that even if the 42 "representatives" were in fact representative – *i.e.* they worked the same number of unpaid hours per week as the average class member – "this would not enable the damages of any members of the class other than the 42 to be calculated" because "[t]o extrapolate from the experience of the 42 to that of the 2341 would require that all 2341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage." *Id.* The Court noted that "[n]o one thinks there was such uniformity." *Id.* For example, if "the average number of overtime hours per class member per week was 5, then awarding 5 x 1.5 x hourly wage to a class member who had only 1 hour of overtime would confer a windfall on him, while awarding the same amount of damages to a class

7

member who had 10 hours of overtime would (assuming the same hourly wage) undercompensate him by half." *Id.* Similarly,

> [s]uppose the same job, for which the piece rate is $500, is completed by one worker in 30 hours (and it is the only job he does that week) and by another in 60 hours (also in a week). The hourly wage of the first worker, $16.67, will be well above the minimum wage, and as he has no overtime either, he has no damages. The hourly wage of the second worker, $8.33, is also above the minimum wage, but he is entitled to 1.5 times that amount for 20 of his 60 hours and thus to a total wage of $583.10 ((8.33 x 40) + ($8.33 x 1.5 x 20)), making his damages $83.10 if DirectSat paid him only $500 for the job.

*Id.* The Court concluded that this variance rendered damage calculations incapable of class treatment. *Id.*

Finally, the Court held that DirectSat's time reporting requirements further complicated the damage determination. The Court recognized that a technician might underreport his time to "impress the company with his efficiency in the hope of obtaining a promotion or maybe a better job elsewhere – or just to avoid being laid off." *Id.* Plaintiffs did not explain how their representative proof would distinguish such "benign underreporting" from unlawful conduct by DirectSat. *Id.* Additionally, to calculate damages, Plaintiffs would need to reconstruct the unreported time they worked from "memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways" unique to each technician. *Id.* at 774-75. The Court held that the experience of a "small, unrepresentative sample" of DirectSat could not "support an inference about the work time of thousands of workers." *Id.* at 775. Thus, "2,341 separate hearings loomed," and class treatment was not appropriate. *Id.*

This case falls squarely within the Seventh Circuit's *Espenscheid* decision. First, the parties and claims are nearly identical. Like the DirectSat installation and service technician Plaintiffs in *Espenscheid*, who sued DirectSat for failing to pay them for all of the time they were required to work in violation of state wage and overtime laws and the FLSA, Plaintiffs here are

8

DirectSat installation and service technicians who have sued DirectSat for failing to pay them for all of the time they were required to work in violation of the IMWL and FLSA. In fact, a sufficient number of class members here consented to join the *Espenschied* FLSA collective action as opt-in Plaintiffs. (Defs.' Mot. Decert., Ex. 4, FLSA *Espenscheid* Consent Forms.) Additionally, like the plaintiffs in *Espenscheid*, Plaintiffs here were paid on a piece-rate basis, not a fixed hourly wage, and were required to report the time they worked in weekly timesheets. Finally, like the plaintiffs in *Espenscheid* who alleged DirectSat forbid them from recording time spent on certain tasks such as calling customers, filling out paperwork, and picking up tools from the company's warehouses, Plaintiffs here allege DirectSat forbid them from recording time spent on certain tasks such receiving daily assignments, calling the day's first customer, driving to the first job, and unloading tools from their van. Indeed, on July 28, 2010, before the *Espenscheid* class was decertified, Plaintiffs cited the district court's original decision certifying the class in *Espenscheid* to oppose decertification here, noting that "[j]ust a few weeks ago, another federal district court in this Circuit rejected *identical arguments* by Defendants in a nationwide collective action brought to redress *the same uniform wage* violations as Plaintiffs." (Dkt. 189, Pls.' Mem. Opp. Decert. 2 n.2) (citing *Espenscheid v. DirectSat USA, LLC*, 2010 WL 2330309 (W.D. Wis. June 7, 2010) (emphasis added)).

Now, however, in an about face, Plaintiffs argue that *Espenscheid* is different because in *Espenscheid* the class members "worked out of dozens of locations throughout the United States, brought claims based on the FLSA and the state wage laws of Minnesota, Wisconsin, and Pennsylvania, and sought damages for undefined work throughout the recorded workday, along with damages for Defendants' miscalculation of wages actually paid." (Pls.' Resp. 14.) Here, Plaintiffs contend, in contrast to *Espenscheid*, the class consists of "only 500 employees" and

"[a]ll class members work in Illinois, advance the same legal theory, assert violations of the same statute, and challenge the same corporate-wide practice." (*Id.*)

But these distinctions do not save the class here. The Seventh Circuit's decision in *Espenscheid* was based on the nature of the technicians' work, the way they were paid, and Plaintiffs' proposed "representative" proof. 705 F.3d at 772-775. The Seventh Circuit did not rely on the number of offices out of which Plaintiffs worked or the fact that they worked in multiple states. The Court did emphasize the burden of "2341 separate hearings," but the burden of 512 separate hearings is still onerous and would defeat "one of the major goals of class action litigation – to simplify litigation involving a large number of class members with similar claims." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002). Moreover, the legal analysis under the IMWL is the same as the legal analysis under the FLSA. *See Urnikis-Negro v. Am. Family Prop. Servs.*, 616 F.3d 665, 672 n.3 (7th Cir. 2010) ("The overtime provision of the Illinois Minimum Wage Law, is parallel to that of the FLSA, and Illinois courts apply the same principles . . . to the state provision."). Thus, Plaintiffs newly found *Espenscheid* distinctions are unpersuasive.

Second, like the plaintiffs in *Espenscheid*, Plaintiffs here propose relying on representative proof, but have failed to demonstrate that the selected representatives provide an appropriate benchmark from which classwide damages can be extrapolated. In their final amended pre-trial plan, Plaintiffs listed eight class members, including the six named Plaintiffs, as "witnesses who will be called," and eight additional class members as "witnesses who may be called." (Dkt. 345, Am. Final Pre-trial Order 4-6.) Plaintiffs have failed, however, to demonstrate that these sixteen witnesses, who comprise roughly 3% of the 512-member class, are representative of the class as a whole. Plaintiffs have not explained "how these 'representatives' were chosen" and "[t]here is no suggestion that sampling methods used in

statistical analysis were employed to create a random sample of class members to be witnesses." *See Espenscheid*, 705 F.3d at 774. Consequently, Plaintiffs have failed to "get around the problem of variance" that the Seventh Circuit identified in *Espenscheid*. *See id.*

Plaintiffs nevertheless argue that they can establish classwide damages at trial because their trial plan "neutralizes the *Espenscheid* problems" by providing "representative evidence which is fully consistent with this Court's directives and goes beyond what is required." (Pls.' Resp. 14.) Plaintiffs contend that "the speculative issues regarding damages, identified in the *Espenscheid* opinion, are managed in this case through the use of a retired U.S. Department of Labor investigator along with empirical GPS data from the technicians' work vehicles." (Pls.' Resp. 2.) But on March 22, 2013, this Court found the testimony of the retired U.S. Department of Labor investigator, Plaintiffs' proposed expert, unreliable and granted Defendants' motion to exclude his testimony. *See Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 1195651 (N.D. Ill. Mar. 22, 2013). Plaintiffs have offered no other evidence to establish the representativeness of their proposed evidence. Thus, Plaintiffs have failed to establish, through a trial plan or otherwise, that their proposed representative proof would cure the variances the Seventh Circuit found fatal in *Espenscheid*.

Third, even if Plaintiffs had demonstrated that the sixteen class members proposed to testify at trial were representative of the class, "this would not enable the damages of any members of the class other than the [16] to be calculated." *See Espenscheid*, 705 F.3d at 774. "To extrapolate from the experience of the [16] to that of the [512] would require that all [512] have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage." *See id.* As in *Espenscheid*, "[n]o one thinks there was such uniformity" here. *Id.* Indeed, Plaintiff Meyers agreed that "everyday was basically different"

11

because the hours a technician worked in a day varied depending on the number of jobs in the day, the complexity of those jobs, and any cancellations that might arise. (Defs.' Mot. Decert., Ex. 3, Meyer Dep. 56-57.) On some days, he would arrive home at 3:00 p.m. in the afternoon, but on other days, he would not get home until 10:00 p.m. (*Id.* 117.) Similarly, Plaintiff Bodie testified that the amount he worked depended on a number of factors, including how many jobs he had in a particular day and "what kinds of jobs [he] had that day." (Defs.' Mot. Decert., Ex 2, Bodie Dep. 89-90.) As the Seventh Circuit recognized in *Espenscheid*, because technicians varied in the amount they worked, the amount of overtime they worked, and the efficiency with which they worked, even if Plaintiffs could establish an "average" number of overtime hours through representative proof, some technicians would receive a windfall while others would be undercompensated. *See Espenscheid*, 705 F.3d at 774.

Fourth, Plaintiffs here, as in *Espenscheid*, have not explained how their representative proof would distinguish between technicians who underreported their time for "benign" reasons, such as to impress DirectSat or to avoid being laid off, from technicians who underreported their time as a result of unlawful conduct by DirectSat. *Id.*

Finally, Plaintiffs here have insufficient records to establish their individualized unreported work time. As this Court has recognized, Plaintiff Williams testified that his time sheet could be missing anywhere from 10 to 15 hours in a given week. *See Farmer*, 2010 WL 3927640, at *7. Similarly, Plaintiffs Junious and Stiffend also acknowledged that their time sheets were not always accurate. *Id.* To make matters worse, Plaintiffs are unable to identify which of their timesheets are inaccurate. *Id.* Consequently, as in *Espenscheid*, to calculate damages here, the hours Plaintiffs worked would need to be reconstructed from "memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways" which

were unique to the individual technician. *See Espenscheid*, 705 F.3d at 774-75. Thus, "[512] separate hearings loom[]," precluding class treatment. *See id.* at 775.

In sum, this case falls squarely within the Seventh Circuit's decision in *Espenscheid*. Plaintiffs have provided the Court with no basis to find that *Espenscheid* does not control. Thus, decertification is appropriate.

## Conclusion

For the reasons herein, the Court grants Defendants' motion for decertification [367].

**SO ORDERED**               **ENTER: 6/6/13**

_____
**JOHN Z. LEE**
**U.S. District Judge**